**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **FREDERICK J. GREDE**, as Liquidation Trustee for the Sentinel Liquidation Trust, | ) ) ) | Case No. 09-cv-05880 |
| Plaintiff, | ) ) | |
| v. | ) ) | Honorable Rebecca R. Pallmeyer |
| **UBS SECURITIES, LLC**, | ) ) | |
| Defendant. | ) ) | |

**TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Catherine Steege (ARDC # 6183529)
Vincent E. Lazar (ARDC # 6204916)
Angela M. Allen (ARDC #6295519)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Phone: (312) 222-9350
Facsimile: (312) 527-0484

Dated: July 28, 2017                     *Counsel for the Liquidation Trustee*

**TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES ........................................................................................iii

INTRODUCTION ........................................................................................................1

ADDITIONAL FACTS .................................................................................................3

    A.  Sentinel's Business Model..................................................................................3

         1.  What Sentinel Told Its Clients About Its Business............................3

         2.  The Regulatory Framework That Governed Sentinel's Business.......................4

         3.  Sentinel's Controlling Persons............................................................5

         4.  Sentinel's Account Structure At The Bank Of New York And JP Morgan. .......5

    B.  How Sentinel's Business Actually Worked. ....................................................6

         1.  The Bank Of New York Loan And Sentinel's Leveraged Trading Strategy................................................................................6

         2.  Sentinel's Purchase And Allocation Of Securities. ...........................7

         3.  Sentinel's Selection Of Collateral To Secure Its Bank Of New York Loan.................................................................................9

         4.  Sentinel's False And Misleading Customer Statements. ...................10

         5.  Sentinel's Fraudulent Interest Allocations.........................................11

    C.  UBS's Relationship With Sentinel And The March 30, 2007 Transfer To UBS.................................................................................................13

         1.  UBS Acquires ABN AMRO, Inc.'s Account ....................................13

         2.  UBS Is Suspicious...............................................................................14

         3.  UBS Demands Return Of Its Funds....................................................15

    D.  Sentinel's Bankruptcy And The Trustee's Lawsuit ..................................16

ARGUMENT ....................................................................................................18

I. UBS Has Failed To Demonstrate That There Is No Genuine Dispute
About Sentinel's Intent To Hinder, Delay Or Defraud Its Creditors. .......................18

II. UBS's Arguments In Support Of Summary Judgment All Fail ...............................19

    A. The Trustee Has Connected Sentinel's Fraud To The
UBS Transfer. ..................................................................................................19

    B. Sentinel's Transfer Of Fictitious Interest To UBS Also
Is Connected To Sentinel's Fraud.......................................................................21

    C. The Trustee's Expert's Testimony Does Not Support UBS's
Summary Judgment Motion.................................................................................24

    D. Neither The UCC Nor The CEA Provide A Defense To UBS ...........................26

    E. The Trustee Is Not Judicially Or Collaterally Estopped By
The Plan ..........................................................................................................29

CONCLUSION ................................................................................................ 32

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adelphia Recovery Trust v. Bank of America*,
  624 F.Supp.2d 292 (S.D.N.Y. 2009) .......................................................................23

*Allstate Ins. Co. v. St. Anthony's Spine & Joint Institute*,
  06 C 7010, 2010 WL 3274283 (N.D. Ill. Aug. 17, 2010) .......................................1

*B.E.L.T., Inc. v. Wachovia Corp.*,
  403 F.3d 474 (7th Cir. 2005) ...........................................................................26, 27

*Bianco v. Hultsteg AB*,
  No. 05 C 0538, 2009 WL 347002 (N.D. Ill. Feb. 5, 2009) ....................................24

*Butler v. Loomer (In re Loomer)*,
  222 B.R. 618 (Bankr. D. Neb. 1998) .....................................................................26

*Butner v. United States*,
  440 U.S. 48 (1979) .................................................................................................29

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ...............................................................................................17

*Christian Bros. High School Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Group., LLC)*,
  439 B.R. 284 (S.D.N.Y. 2010) ....................................................................22, 23, 28

*Cox v. Nostaw, Inc. (In re Central Illinois Energy Cooperative)*,
  521 B.R. 868 (Bankr. C.D. Ill. 2014) ..............................................................20, 23

*Daly v. Deptula (In re Carrozzella & Richardson)*,
  286 B.R. 480 (D. Conn. 1982) .....................................................................26, 28

*Daly v. Kennedy (In re Kennedy)*,
  279 B.R. 455 (D. Conn. 2002) ...............................................................................20

*Gecker v. Goldman Sachs & Co. (In re Automotive Professionals Inc.)*,
  398 B.R. 256 (Bankr. N.D. Ill. 2008) ....................................................................28

*Grede v. Bank of New York Mellon*,
  441 B.R. 864 (N.D. Ill. 2010) .....................................................................17, 18, 24

*Grede v. FCStone, LLC*,
  485 B.R. 854 (N.D. Ill. 2013) ................................................................................13

*Grede v. FCStone, LLC*,
  746 F.3d 244 (7th Cir. 2014) ................................................................4, 5, 10, 23

*Harman v. First American Bank of Maryland (In re Jeffrey Bigelow Design Group)*, 956 F.2d 479 (4th Cir. 1992).......................................................20

*In re Bernard L. Madoff Investment Securities. LLC*,
  654 F.3d 229 (2d Cir. 2011)................................................................................23

*In re Equipment Acquisition Resources, Inc.*,
  481 B.R. 422 (Bankr. N.D. Ill. 2012) ..........................................................26, 27

*In re H. King & Associates*,
  295 B.R. 246 (Bankr. N.D. Ill. 2003) ...........................................................5, 26

*In re Image Worldwide, Ltd.*,
  139 F.3d 574 (7th Cir.1998) ..................................................................................1

*In re Marrs-Winn Co.*,
  103 F.3d 584 (7th Cir. 1996) ..............................................................................29

*In re Petters Co., Inc.*,
  499 B.R. 342 (Bankr. D. Minn. 2013) ...........................................................27, 28

*In re Roco Corp.*,
  701 F.2d 978 (1st Cir. 1983)..................................................................................5

*In re Roti*,
  271 B.R. 281 (Bankr. N.D. Ill. 2002), *aff'd sub nom. Nelmark v. Helms*, No.
  02 C 0925, 2003 WL 1089363 (N.D. Ill. Mar. 11, 2003).................................26, 28

*In re Sentinel Management Group, Inc.*,
  728 F.3d 660 (7th Cir. 2013) .......................................................................... passim

*In re Sentinel Management Group, Inc.*,
  398 B.R. 281 (Bankr. N.D. Ill. 2008) ................................................................30

*Johnson v. Neilson (In re Slatkin)*,
  525 F.3d 805 (9th Cir. 2008) ..............................................................................23

*Keller v. United States*,
  58 F.3d 1194 (7th Cir. 1995) ..............................................................................24

*Kelly v. Armstrong*,
  141 F.3d 799 (8th Cir. 1998) ..............................................................................20

*King v. Ionization Int'l, Inc.*,
  825 F.2d 1180 (7th Cir. 1987) ...............................................................20, 21, 26

*Long v. Fairbank Farms, Inc.*,
  No. 1:09-cv-592-GZS, 2011 WL 2516378 (D. Me. May 31, 2011).......................................24

*Martino v. Edison Worldwide Capital (In re Randy)*,
  189 B.R. 425 (Bankr. N.D. Ill. 1995) ...................................................................................5

*Scholes v. Lehmann*,
  56 F.3d 750 (7th Cir. 1995) .........................................................................21, 22, 26, 28

*Securities Investor Protection Corp. v. Bernard L. Madoff Investment
  Securities LLC*, 476 B.R. 715 (S.D.N.Y. 2012), *aff'd sub nom. In re Bernard
  L. Madoff Investment Securities LLC*, 773 F.3d 411 (2d Cir. 2014)......................................28

*Securities Investor Protection Corp. v. Bernard L. Madoff Investment
  Securities LLC*, 563 B.R. 737 (Bankr. S.D.N.Y. 2017) .............................................................1

*Securities & Exchange Commission v. Sentinel Management Group, Inc.*,
  2012 WL 1079961 (N.D. Ill. Mar. 30, 2016)..........................................................................11

*Sparling v. Doyle*,
  No. EP-13-CV-00323-DCG, 2016 WL 236266 (W.D. Tex. Jan. 20, 2016)..........................24

*United States v. All Funds on Deposit*,
  137 F. Supp. 3d 125, 131 (D. Mass. 2016) ....................................................................20, 21

*United States v. Bloom*,
  846 F.3d 243 (7th Cir. 2017) ...........................................................................................5, 12

*United States v. McCombs*,
  30 F.3d 310 (2d Cir. 1994)...................................................................................................26

## STATUTES

7 U.S.C. §6d(b) ...........................................................................................................................4

11 U.S.C. §548................................................................................................................... passim

15 U.S.C. §80b-1 ........................................................................................................................2

## OTHER AUTHORITIES

17 C.F.R. 1.20 .............................................................................................................................4

17 C.F.R. §275.206..........................................................................................................5, 19, 21

Frederick J. Grede, not individually but as Liquidation Trustee of the Sentinel Liquidation Trust ("**Trustee**") respectfully submits his Memorandum of Law In Opposition to UBS Securities, LLC's ("**UBS**") Motion for Summary Judgment ("**Motion**").

## INTRODUCTION

On March 30, 2017, Sentinel Management Group, Inc. ("**Sentinel**") moved over $100 million from a "SEG 3" account that was supposed to hold property in segregation for creditors other than UBS and used that money to pay $14,401,341.15 to UBS. The Trustee has sued to avoid the $14.4 million transfer as an actual fraudulent transfer under 11 U.S.C. §548(a)(1)(A). To prove his *prima facie* case, the Trustee is required to demonstrate that Sentinel: (i) with an "actual intent to hinder, delay or defraud" any of its creditors; (ii) transferred an interest it had in property to UBS; (iii) within two years of Sentinel's bankruptcy filing. 11 U.S.C. §548(a)(1)(A).

UBS's motion for summary judgment challenges only the first element of the Trustee's claim: whether Sentinel acted with an intent to hinder, delay *or* defraud any of its creditors when it transferred $14.4 million to UBS. "Summary judgment is notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominant roles." *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 563 B.R. 737, 751 (Bankr. S.D.N.Y. 2017) (denying defendants' motion for summary judgment under §548(a)). Indeed, the Seventh Circuit "has instructed courts to use summary judgment sparingly when subjective intent is a factor in the determination." *See Allstate Ins. Co. v. St. Anthony's Spine & Joint Inst.*, 06 C 7010, 2010 WL 3274283, at *3 (N.D. Ill. Aug. 17, 2010) (quoting *McHugh v. Anderson (In re McHugh)*, 02 A 00254, 2003 WL 21018601, at *7 (Bankr. N.D. Ill. May 1, 2003))

(denying summary judgment in Uniform Fraudulent Transfer Act case).[1]

In this case, summary judgment on the question of intent is particularly inappropriate in light of the Seventh Circuit's decision, *In re Sentinel Management Group, Inc.*, 728 F.3d 660, 666-68 (7th Cir. 2013). In *Sentinel*, the Seventh Circuit rejected the very same arguments that UBS makes here in support of its Motion and held that the Trustee proved that Sentinel acted with an actual intent to hinder, delay or defraud its creditors when Sentinel transferred property Sentinel was legally required to hold in segregation for other creditors to the Bank of New York Mellon. The Seventh Circuit reached this conclusion, even though as UBS argues here, the Bank of New York was contractually entitled to the transfers it had received. *Sentinel*, 728 F.3d at 667.

UBS's Motion barely references the Seventh Circuit's *Sentinel* decision—which is controlling on the Court and the parties—citing it only for the proposition that the Commodity Exchange Act ("**CEA**") makes it unlawful for a futures commission merchant ("**FCM**") to use property it is required to hold in segregation for others. (*See* UBS Memorandum in Support of its Motion for Summary Judgment ("**UBS Mem.**," Dkt.97) 18.) Yet, that is exactly what happened here. As set forth in the Trustee's Statement of Additional Facts, Sentinel paid UBS with funds Sentinel withdrew from an account that contained property Sentinel was legally obligated to hold for customers other than UBS. (*See* Trustee's Statement Of Additional Facts ("**Tr.SOF**") ¶33.) In other words, just as it did when it pledged customer property for the benefit of the Bank of New York, Sentinel illegally transferred property it was required to hold for others to UBS in violation of the Investment Advisors Act of 1940, 15 U.S.C. §80b-1 *et seq.* ("**IAA**") and the CEA. That is the *exact* same fact pattern the Seventh Circuit held proved that Sentinel acted with an intent to

---

[1] Cases interpreting the Uniform Fraudulent Transfer Act are instructive in interpreting the analogous provisions of the bankruptcy code because "UFTA was an effort to harmonize state law with the Bankruptcy Code." *See In re Image Worldwide, Ltd.,* 139 F.3d 574, 577 (7th Cir.1998).

hinder, delay or defraud its creditors in the Bank of New York litigation. *Sentinel*, 728 F.3d at 666-68. The Trustee therefore has raised a genuine issue of material fact that defeats UBS's Motion; the Motion should be denied.

## ADDITIONAL FACTS

### A. Sentinel's Business Model.

Sentinel was an Illinois corporation headquartered in Northbrook, Illinois. (Tr.SOF¶1.) Before Sentinel filed for bankruptcy, Sentinel managed investments for various clients, including FCMs, hedge funds, financial institutions, pension funds, and individuals. (Tr.SOF¶1.)

### 1. What Sentinel Told Its Clients About Its Business.

Sentinel marketed its investment services as safe and secure. (Tr.SOF¶2.) Sentinel's website promised "same-day liquidity" and "safety of principal" and represented that it held all customer funds in segregated, custodial accounts. (Tr.SOF¶2.) Sentinel further represented that it invested customer funds in highly-liquid and "readily marketable government and corporate securities" that offered "maximum liquidity" and a "minimum of risk." (Tr.SOF¶2.) Sentinel also represented that it did not use "derivatives, options, or any other 'financial engineering'" to enhance yields. (Tr.SOF¶2.)

Sentinel classified its customers into three segments or "SEGs" based on their regulatory status and the source and nature of their investments, supposedly to segregate customer funds. (Tr.SOF¶3.) Those classifications were:

> **SEG 1:** Comprised of FCMs' customer funds required to be invested in compliance with CFTC Rule 1.25 and held in compliance with CEA and CFTC segregation requirements;
>
> **SEG 2:** Comprised of FCMs' foreign futures and foreign options customer funds required to be invested in compliance with CFTC Rule 1.25 and held in separate accounts in compliance with CFTC Rule 30.7; and

> **SEG 3:** Comprised of hedge funds, other public and private trading funds, individual investors and FCMs investing proprietary or "House" funds.

(Tr.SOF¶3.)

Within each SEG, Sentinel further divided its customers into 11 groups, each of which consisted of customers with the same risk and return goals. (Tr.SOF¶4.) Although Sentinel customers did not have the right to direct Sentinel to purchase particular securities, Sentinel was supposed to follow the investment guidelines when deciding what securities to purchase. (Tr.SOF¶4.) Sentinel also managed a "House" or "Street" portfolio for the benefit of certain insiders, including Sentinel's chairman, Philip Bloom, its chief executive officer Eric Bloom, and its vice-president of trading Charles Mosley. (Tr.SOF¶4.)

Customers of each SEG signed identical agreements with Sentinel requiring segregation and governing the handling of customer assets. (Tr.SOF¶5.) Sentinel represented to customers that under the CEA and Commodity Futures Trading Commission ("**CFTC**") rules and the IAA and the Securities and Exchange Commission ("**SEC**") rules, it maintained the assets of the SEG 1, SEG 2, and SEG 3 customer pools in separate custodial accounts, that it segregated the assets of the SEG 1, 2, and 3 customer pools from Sentinel's own assets, and that it segregated the assets of each of the SEG 1, 2, and 3 customer pools from the assets of the other SEG pools. (Tr.SOF¶5.)

### 2. The Regulatory Framework That Governed Sentinel's Business.

Sentinel was registered with the SEC as an investment advisor and with the CFTC as a FCM. (Tr.SOF¶6.) Although Sentinel did not itself execute or clear futures transactions, it was registered as an FCM because it provided investment advisory services to FCMs investing funds of their commodity customers. (Tr.SOF¶6.) The CEA and CFTC Rules required Sentinel to segregate commodity customer funds from those of other customer groups and from Sentinel's own assets. 7 U.S.C. §6d(b); 17 C.F.R. 1.20; *see also Grede v. FCStone, LLC,* 746 F.3d 244, 247

4

(7th Cir. 2014). Similarly, the SEC Rules promulgated under the IAA required Sentinel to segregate the funds it held for all of its customers from those of other customer groups and from Sentinel's own assets. 17 C.F.R. §275.206; *see also FCStone,* 746 F.3d at 247.

### 3. Sentinel's Controlling Persons.

At all times relevant to this action, Sentinel was managed by its CEO Eric Bloom and its VP Mosley. (Tr.SOF¶7.) Both Eric Bloom and Mosley are currently serving lengthy prison sentences for wire fraud and investment fraud related to their misconduct at Sentinel. *See United States v. Bloom*, 846 F.3d 243, 249-50, 256-57 (7th Cir. 2017). In summary, the United States convicted both men of intentionally defrauding Sentinel's customers by wrongfully using property that the CEA and IAA required Sentinel to hold in segregation for its customers, resulting in over $600 million in losses. *Id.* at 245-48. The intent of Bloom and Mosley is imputed to Sentinel as they each controlled Sentinel's activities and caused it to engage in the illegal conduct set forth below. *See, e.g.*, *In re Roco Corp.*, 701 F.2d 978, 984 (1st Cir. 1983) ("[w]e may impute any fraudulent intent of Consove to the transferor Roco because, as the company's president, director, and sole shareholder, he was in a position to control the disposition of its property"); *In re H. King & Assocs.*, 295 B.R. 246, 285 (Bankr. N.D. Ill. 2003) ("[b]ecause Joe was an insider of the Debtor and, as its president, he was in a position to control the disposition of the Debtor's property, Joe's fraudulent intent may be imputed to the Debtor"). Moreover, Bloom's and Mosley's criminal convictions conclusively determine their fraudulent intent. *See, e.g., Martino v. Edison Worldwide Capital (In re Randy)*, 189 B.R. 425, 440 (Bankr. N.D. Ill. 1995).

### 4. Sentinel's Account Structure At The Bank Of New York And JP Morgan.

Sentinel maintained both (i) segregated accounts, which were to hold only segregated funds and property of clients in a particular SEG, and (ii) non-segregated accounts, which were subject

to the Bank of New York's liens, as described below. (Tr.SOF¶8.) Sentinel had nine segregated accounts at the Bank of New York: three segregated cash accounts, three segregated government securities accounts and three segregated DTC securities accounts for its SEG 1, SEG 2 and SEG 3 customers respectively. (Tr.SOF¶8.)

Sentinel also maintained several additional accounts at the Bank of New York that were not denominated for SEG 1, 2, or 3 customers. (Tr.SOF¶9.) Sentinel had a House cash account. (Tr.SOF¶9.) It also had a SEN account through which it settled all of its investment and trading activity regardless of whether the activity was for a particular SEG or the House. (Tr.SOF¶9.) Sentinel also had a DTC securities clearing account and Euroclear clearing account. (Tr.SOF¶9.) Because the SEN account did not hold funds overnight, Sentinel also had an SLM account in which Sentinel held funds and securities overnight. (Tr.SOF¶9.)

Sentinel also established three non-interest bearing cash accounts at JP Morgan as well as three interest bearing cash accounts that were linked to the corresponding non-interest bearing cash accounts. (Tr.SOF¶10.) These three non-interest bearing accounts and their three interest bearing counterparts were segregated accounts established to hold SEG 1, SEG 2, and SEG 3 customer funds respectively. (Tr.SOF¶10.) The JP Morgan accounts were non-transactional, meaning that their sole purpose was to hold customer cash in segregation. (Tr.SOF¶10.)

**B. How Sentinel's Business Actually Worked.**

### 1. The Bank Of New York Loan And Sentinel's Leveraged Trading Strategy.

Beginning in 1997, the Bank of New York began providing an overnight loan to Sentinel. (Tr.SOF¶11.) The loan's original purpose was to provide Sentinel with liquidity for customer redemptions and failed trades. (Tr.SOF¶11.) To secure this loan, Sentinel pledged all of the cash and other property in the House, SEN, SLM, DTC securities clearing, and Euroclear clearing

accounts. (Tr.SOF¶11.)

Beginning in 2001 and increasingly by 2004, Sentinel began to use the Bank of New York loan to fund its own proprietary trading in repurchase agreements ("**Repos**") as part of a leveraged trading strategy. (Tr.SOF¶12.)[2] At all times relevant to this Motion, Sentinel itself never had more than $3 million of its own capital. (Tr.SOF¶12.) Therefore, to finance its leveraged trading, Sentinel borrowed money from the Bank of New York loan to cover the "haircuts" associated with these Repos. (Tr.SOF¶12.) Because Sentinel had little to no capital of its own, as the Bank of New York loan increased, Sentinel routinely began to pledge hundreds of millions in securities that it told its customers were located in the SEG accounts to secure the Bank of New York loan. (Tr.SOF¶13.) In fact, these securities were in the non-segregated lienable accounts at the Bank of New York. (Tr.SOF¶13.)

As Sentinel expanded its leveraged trading, its loan balance grew—increasing from $55 million in May, 2004 to $300 million in September, 2006. (Tr.SOF¶14.) By early 2007, Sentinel held more than $2 billion in securities through Repos. (Tr.SOF¶14.) During this same time period, between May, 2004 and June, 2007, Sentinel's segregation shortfalls—the difference between what it owed its customers and the amount of assets actually held in segregation for those customers—grew from roughly $150 million to over $800 million. (Tr.SOF¶14.)

### 2. Sentinel's Purchase And Allocation Of Securities.

Sentinel did not use a customer's cash to purchase a specific security for that customer. (Tr.SOF¶15.) Instead, beginning in 2004, Sentinel leveraged the cash it managed with loans from

---

[2] A Repo is a method of financing the purchase price for a security. Sentinel would buy a security and then sell the security to its Repo counterparty with an agreement to repurchase the security in the future under certain conditions. The Repo counterparty would finance part of the purchase price and Sentinel would borrow money from the Bank of New York to cover the difference, known as the "haircut." *Sentinel*, 728 F.3d at 664.

the Bank of New York and Repo counterparties to buy securities which largely did not meet the investment guidelines Sentinel told its customers it would follow. (Tr.SOF¶15.)

To create the impression that customer funds were in fact segregated and used to purchase compliant securities, Sentinel went through very involved machinations of "allocating" portions of its securities to the SEGs on a daily basis. (Tr.SOF¶16.) But the fiction Sentinel portrayed in its customer accounting records bore no resemblance to the reality of its activities. (Tr.SOF¶16.)

The starting point of this allocation process was Sentinel's securities inventory. (Tr.SOF¶17.) At some point after Sentinel bought a security, Sentinel would "allocate" the security to a SEG or House account on its securities inventory. (Tr.SOF¶17.) Sentinel's VP Mosley would write down where the security should be allocated on the trade ticket. (Tr.SOF¶17.) If he failed to do that, which happened frequently, an assistant Sentinel trader would allocate the security. (Tr.SOF¶17.) After the initial allocation, Sentinel moved securities between its SEG groups and sold them without customer permission. (Tr.SOF¶17.)

Because many of the securities Sentinel purchased, including hundreds of millions of dollars in collateralized debt obligations ("**CDOs**"), were not suitable under its investment guidelines for any of Sentinel's SEGs, Sentinel generally did not allocate these non-compliant securities to any of its SEGs. (Tr.SOF¶18.) Instead, assistant trader Jeffrey Logan testified that Sentinel treated these CDOs and other non-compliant securities as if it had purchased them for Sentinel's House account, even though the House account did not have sufficient funds to finance these purchases. (Tr.SOF¶18.)

Each day, using its SEG-level allocations, Sentinel would allocate the securities on its securities inventory to the groups within each SEG on its customer ledger. (Tr.SOF¶19.) As Logan described it, Sentinel's customer allocation process was just an exercise in matching customer

balances with securities balances so that the two matched. (Tr.SOF¶19.) If Sentinel allocated a security to SEG 1 on the securities inventory that security was eligible to be allocated to a SEG 1 (but not a SEG 3) customer group on the customer ledger. (Tr.SOF¶19.) Because Repos never appeared on customer statements, Sentinel did not allocate the vast majority of its portfolio to any customers. (Tr.SOF¶19.) Sentinel also made these customer allocations without regard to its investment guidelines. (Tr.SOF¶19.)

Critically, in allocating securities to customer groups, Sentinel did not consider either the source of cash used to buy the securities or the custodial location of securities. (Tr.SOF¶20.) Sentinel often did not hold the securities it had allocated to SEG 1 customers in its SEG 1 segregated account and instead held the securities in an account against which Bank of New York held a lien. (Tr.SOF¶20.) Sentinel did this on a massive scale. (Tr.SOF¶20.) As a result, Sentinel held hundreds of millions of dollars in securities it allocated to customers in accounts where those securities served as collateral for Sentinel's Bank of New York loan. (Tr.SOF¶20.)

Similarly, Sentinel's sales of securities also had no correlation with customer activity. (Tr.SOF¶21.) Sentinel generally did not sell securities appearing on a customer's statement to fund that customer's redemptions. (Tr.SOF¶21.) Customer redemptions were generally funded by other customer deposits or with proceeds of the Bank of New York loan. (Tr.SOF¶21.) Typically, securities that had been allocated to a redeeming customer were either allocated to other customers or went into Sentinel's large unallocated pool of securities. (Tr.SOF¶21.)

### 3. Sentinel's Selection Of Collateral To Secure Its Bank of New York Loan.

Sentinel's process for pledging collateral to secure its Bank of New York loan was equally "random." (Tr.SOF¶22.) The Bank of New York required Sentinel to hold pledged securities in a lienable account (principally the Bank of New York SEN account). (Tr.SOF¶22.) Logan and the

other employees who directed the movement of securities into the lienable SEN account frequently moved the largest blocks of government securities—whether allocated to SEG 1 or SEG 3—into the SEN account. (Tr.SOF¶22.) Assistant trader Crystal Tillett testified that she and others who made these transfers often picked the largest securities because "it just made it easier." (Tr.SOF¶22.) When doing so, Sentinel did not consider to which SEG or customer group it had allocated the securities. (Tr.SOF¶22.) Consequently, Sentinel routinely pledged as collateral for its Bank of New York loan hundreds of millions of dollars in securities it had allocated to customers and which appeared on customer statements as though the collateral was held in segregated accounts. (Tr.SOF¶23.) Sentinel's use of securities allocated to customers as collateral for the Bank of New York loan left its segregated accounts "chronically underfunded" and in violation of federal segregation rules. (Tr.SOF¶23); *see also FCStone,* 746 F.3d at 248.

### 4. Sentinel's False And Misleading Customer Statements.

To conceal its activities, Sentinel sent false and misleading daily account statements to its customers. (Tr.SOF¶24.) Sentinel's statements represented on a daily basis that Sentinel was holding specific securities in segregation for customers when in fact, those securities were often not in the accounts as represented and were pledged to secure the Bank of New York loan or in an account segregated for the benefit of a different SEG. (Tr.SOF¶¶24-25.)

Sentinel's daily account statements also omitted material information, including: (1) the fact that securities appearing on a customer's statement as being held in segregation were pledged as collateral for the Bank of New York loan; and (2) that Sentinel held billions of dollars in securities pursuant to Repos, which placed customers at greater risk than Sentinel's alleged investment guidelines suggested was the case. (Tr.SOF¶26.) In fact, the expert retained by UBS's

lawyers in a related adversary proceeding testified that Sentinel's customer statements were "false representation[s] to the customers by omission." (Tr.SOF¶26.)

### 5. Sentinel's Fraudulent Interest Allocations.

Sentinel promised customers that they would receive interest based on their *pro rata* share of the interest earned only on the securities appearing on their daily customer statements. (Tr.SOF¶27.) In fact, every day, Sentinel calculated the total amount of interest accrued on the entire pool of securities Sentinel managed—whether held through a Repo or owned and whether allocated to customers or not—and after deducting the interest Sentinel paid to the Bank of New York and Repo fees, then allocated to customers approximations of what it thought customers might expect to earn. (Tr.SOF¶28.) In this way, Sentinel's insiders kept for themselves a substantial portion of the interest yield accruing on Sentinel's overall securities portfolio. (Tr.SOF¶28.)

After Sentinel filed for bankruptcy, the question of the legality of Sentinel's interest payments to customers has been litigated in multiple forums. In the SEC's suit against among others, Sentinel's VP Mosley, Judge Kocoras entered summary judgment against Mosley on the claim that he aided and abetted Sentinel's fraud, finding that:

> Mosley admitted that Sentinel would pool the interest generated by the various portfolios, including the House Portfolio, and distribute that interest across the investors' portfolios. Mosley further admitted that the interest distributed to investors bore no relation to the interest that the investors' securities had actually accrued. . . . The evidence thus establishes that Mosley actively and knowingly participated in Sentinel's scheme to defraud its investors, obtained money by means of Sentinel's misrepresentations, and engaged in a course of fraudulent business.

*SEC v. Sentinel Mgmt. Grp., Inc.*, 2012 WL 1079961, at *16 (N.D. Ill. Mar. 30, 2016).

Likewise, the Seventh Circuit upheld CEO Eric Bloom's fraud conviction, based in part on the phony allocation of interest to customers, holding that:

11

The government also offered sufficient evidence that Bloom intentionally defrauded customers by manipulating yield rates. Several witnesses testified about Bloom's involvement with this practice. Their testimony was corroborated by documents and recorded phone calls. Sentinel used the yields from the house account and the Prime Portfolio to inflate artificially the returns from the 125 Portfolio. Sentinel's high-risk trading in the house account generated higher returns than the more conservative 125 Portfolio. The Prime Portfolio, which was slightly riskier than the 125 Portfolio, likewise generated higher returns. Sentinel redistributed some of these returns from the house account and the Prime Portfolio to the 125 Portfolio, effectively using the riskier accounts to subsidize the more conservative account. With these inflated rates of return in the 125 Portfolio, Sentinel could attract new clients by outperforming its competition. Indeed, it advertised these rates in its marketing material and on its website.

Sentinel employees testified that they doctored the yield rates on a daily basis from 2004 until the company's bankruptcy in 2007. Instead of paying customers the interest they actually earned, Sentinel employees divvied up interest payments according to the instruction of Bloom or Charles Mosley. Bloom in fact created a spreadsheet to help employees calculate how to redistribute funds, which was called the "Daily Yield/Rate Calculation." The spreadsheet listed both the actual interest earned by customers' securities and the rate set by Sentinel.

The rate setting often favored the customers in "Seg 1" (125 Portfolio). For example, on December 7, 2006, the interest actually earned by Seg 1 was $96,942.63. After the rate manipulation by Sentinel, that portfolio was allocated $103,832.46. On that same day, Seg 3 (Prime Portfolio) actually earned $148,005.09 in interest and the house account earned $17,949.85. After Sentinel's rate adjustment, Seg 3 customers were paid just $112,657.32 and the house account received $49.11. . . Another employee testified that he raised the matter with Bloom before May 15, 2007, and Bloom acknowledged that Seg 3 and the house account supplemented Seg 1. . . This evidence was sufficient for the jury to conclude that *Bloom intentionally defrauded his clients by manipulating their yield rates.*

*Bloom*, 846 F.3d at 251-52 (emphasis added).

Although UBS contends that the Trustee's expert James Feltman testified in a deposition in a related adversary proceeding, *Grede v. FCStone, LLC*, 09 C 136, that Sentinel did not commit a fraud in connection with its calculation of interest (UBS Mem. 13-14), in fact, in that very deposition, Feltman testified that interest income was paid to customers with cash from Sentinel's commingled SEN account or other customers' deposits, that "[SEN] cash was frequently and regularly transferred to the [Bank of New York segregated cash] accounts, which were used to

12

fund withdrawals, and that was commingled cash," and "to the extent that withdrawals included interest earned by a customer, the actual payment of interest was made with commingled funds." (Tr.SOF¶29.)

In addition, Feltman testified at trial in that case that Sentinel's entire leverage scheme was unlawful, including the interest that was fraudulently calculated and paid to redeeming investors using the profits earned on the entire commingled pool, and that the manner in which Sentinel credited interest was designed to avoid suspicions about its illegal activity. (Tr.SOF¶29.) More specifically, Feltman testified at trial that: (a) "the interest allocations were items that the company – that the company created and were not derived from the securities that were on that customer statement for that day"; (b) the interest rates "are what Sentinel thought their customers would expect" and "are estimates"; and (c) Sentinel allocated interest from securities that never appeared on customer statements. (Tr.SOF¶29.) District Judge Zagel, who heard Feltman's testimony credited it, finding as did Judge Kocoras and the Seventh Circuit, that Sentinel "included interest [on customer statements] earned on billions of dollars of securities that did not appear on any customer statements and interest earned on securities listed on the account statements of other customer groups." *Grede v. FCStone, LLC*, 485 B.R. 854, 863 (N.D. Ill. 2013).

## C. UBS's Relationship With Sentinel And The March 30, 2007 Transfer To UBS.

### 1. UBS Acquires ABN AMRO, Inc.'s Account.

On June 16, 2000, ABN Amro, Inc. entered into an Investment Advisory Agreement with Sentinel. (UBS's Local Rule 56.1 Statement of Uncontested Material Facts (Dkt. 98, "**UBS SOF**") ¶11.) ABN Amro was a SEG 1 customer, invested in Group 7, which meant that the securities segregated for its benefit were supposed to be complaint with CFTC Rule 1.25. (UBS SOF¶12.) On September 30, 2016, ABN Amro transferred the assets of its global futures operation, including

its account at Sentinel, to UBS. (UBS SOF¶16.)

### 2. UBS Is Suspicious.

The limited written discovery taken to date shows that UBS was suspicious of the interest Sentinel claimed it was earning. (Tr.SOF¶31.) On March 13, 2007, an internal UBS email shows that UBS prepared an analysis of the interest earned on certain investments, including its Sentinel account, and the Excel report that UBS prepared on this topic, complete with a bar chart, showed that Sentinel earned the highest interest rate of the five investments analyzed. (Tr.SOF¶31.)

Shortly thereafter, on March 28, 2007, UBS employee Gregory Hardiman called Sentinel's Sales Manager, Steven Stitle, to discuss UBS's account. Sentinel recorded this call. (Tr.SOF¶31.) Hardiman stated that his "understanding is [Sentinel's] rates of return are fairly high relative to what anybody out there is getting at the moment." (Tr.SOF¶31.) Hardiman said that he would need to have a conversation with the portfolio manager [Mosley] and had the following questions: "What are the risks, what--where are you at within 125, where are you getting the pickup and -- and how. So are you going out double A, you know, going all--all the way in, you know -- you know, all the way out on the credit spectrum in terms of 125 and all the way out in terms of duration." (Tr.SOF¶31.) Stitle did not answer these questions, but agreed to set up a meeting between Hardiman and Mosley. (Tr. SOF¶31.) Hardiman emphasized with respect to the meeting that "I don't think it's going to be a dog and pony show," "[i]t has to be specific to the portfolio," "I would like to see the portfolio manager in there ... [e]xplaining what he is doing and how..." (Tr.SOF¶31.)

Immediately after the call, Stitle emailed Eric Bloom and carbon-copied Charles Mosley, stating:

> Just got off the phone with Greg Hardiman @ UBS. They are pulling the $$$ because they are not comfortable with how we obtain the yields we post without

incurring some "unknown" level of risk. Greg agreed to give us a chance to explain how we achieve this but is expecting a Q&A session with Stamford with you, me and Charles. I suspect the bulk of the questions will be directed to Charles . . . Bottom line is that they can't stay invested in a vehicle that they don't fully understand & are comfortable with."

(Tr.SOF¶32.)

### 3. UBS Demands Return Of Its Funds.

Two days after Hardiman spoke with Stitle, on March 30, 2007, UBS instructed Sentinel to return all of the funds it had invested with Sentinel plus interest. (UBS SOF¶20.) That same day, Sentinel transferred $108,387,950.87 to UBS, the balance of UBS's Sentinel Account, which included $14,401,341.15 of "interest" that was never actually earned by securities purportedly segregated and allocated to UBS. (Tr.SOF¶33.)

Sentinel paid the $14,401,341.15 of interest to UBS using funds held in a JP Morgan SEG 3 account. (Tr.SOF¶33.) Before making the wire transfer to UBS, Sentinel transferred $120 million from the JP Morgan SEG 3 cash account to Sentinel's SEN account. Sentinel then transferred $127.6 million to the Bank of New York SEG 1 cash account and then wired the payment to UBS. (Tr.SOF¶33.) On March 30, 2007, 29% of the securities and cash allocated to SEG 1 customers were not held in segregation. (Tr.SOF¶33.) On March 30, 2007, 55% of the securities and cash allocated by Sentinel to SEG 3 customers were not held in segregation. (Tr.SOF¶33.) That meant that the SEG 3 accounts were undersegregated by $386,800,000. (Tr.SOF¶33.)

In August 2007, after news hit that Sentinel had failed, Hardiman internally noted to another UBS colleague: "Hope people realize the value added by exiting the Sentinel Fund . . . Don't think people really appreciate/understand what could have been and the headache, potential issues/losses avoided here. People should be aware that we performed due diligence on the fund and made an informed decision to exit. I hope you do." (Tr.SOF¶34.) Hardiman then internally emailed others at UBS an update: "ETD acquired a $100mm position in Sentinel's 1.25 fund from

ABN. After due diligence performed, we exited Sentinel in Q107, avoiding a potentially large loss. News reports estimate losses of up to 100% of investments in the fund." (Tr.SOF¶34.) Another UBS employee noted: "We had inherited a $100mm placement with Sentinel with the ABN merger that Greg decided to exit in Q1 due to his concerns about the funds." (Tr.SOF¶34.)

### D. Sentinel's Bankruptcy And The Trustee's Lawsuit.

On August 17, 2007, Sentinel filed a chapter 11 petition. (Bankr. Dkt. 07 B 14987 at 1.) Because of allegations of fraud surrounding its business, on August 21, 2007, Sentinel itself moved for the appointment of a trustee. (Bankr. Dkt. 36.) On August 23, 2007, the Bankruptcy Court granted the motion and on August 29, 2007, the Bankruptcy Court approved the appointment of the Trustee. (Bankr. Dkt. 56, 105.) On December 15, 2008, the Bankruptcy Court confirmed Sentinel's bankruptcy plan, which appointed the Trustee as trustee of Sentinel's Litigation Trust. (Bankr. Dkt. 1257.)

On June 24, 2009, the Trustee filed suit against UBS. (Bankr. Adv. Dkt. 09-00521 at No.1.)[3] On November 4, 2009, this Court withdrew the reference (Dkt. 4), as it had done for all of the Trustee's avoidance actions against SEG 1 customers. The SEG 1 defendants, most of whom are represented by the same counsel that represents UBS, sought to delay the Trustee's lawsuits against them until the Trustee's lawsuit against Bank of New York was resolved, hoping that if the Trustee prevailed entirely against Bank of New York, he would drop the lawsuits or settle more

---

[3] UBS suggests that the Court should question the Trustee's suit against UBS because Sentinel "transferred millions of dollars to many other customers between February and April, 2007" before it placed a freeze on customer redemptions, yet the Trustee allegedly has not sued those similarly-situated customers. (UBS Mem. 12 n.6.) That is not true. The Trustee sued UBS because it was the *only* customer during that time period, other than Sentinel insiders Phillip and Sybil Bloom, to receive not only a 100% return of its investment but also significant fictitious interest. The Trustee sued the Blooms and recovered the pre-freeze transfers made to them, most of which (like the situation here) represented false profits generated through the unlawful use of customer securities. (*See Grede v. Bloom,* Case No. 07-00981 (Bankr. N.D. Ill.) Dkts. 1, 7, 95.)

favorably with the SEG 1 defendants. (Tr.SOF¶36.) On November 3, 2010, however, this Court ruled that Sentinel did not have actual fraudulent intent when it took customer funds out of segregation and pledged them as collateral to Bank of New York. *Grede v. Bank of N.Y. Mellon,* 441 B.R. 864, 904 (N.D. Ill. 2010).

UBS responded by filing a motion for summary judgment, arguing that this Court's ruling in the Bank of New York litigation estopped the Trustee from proving his actual fraudulent transfer claim. (Dkt. 33 at 11.) The parties completed briefing UBS's original summary judgment motion on June 25, 2012. (Dkt. 32-41.) On August 26, 2013, the Seventh Circuit reversed the District Court's decision in the Bank of New York lawsuit, holding that the Trustee had proved that Sentinel acted with an intent to hinder, delay or defraud its creditors. *Sentinel*, 728 F.3d at 666-68. In response to this reversal, the Trustee sought to commence discovery and also moved to supplement his briefing in response to UBS's summary judgment briefing. (Dkt. 63.) UBS continued to seek to stay the litigation. (Dkt. 49.) The District Court allowed only limited written discovery to proceed, indicating on January 14, 2015, that it would rule shortly on the summary judgment motion. (Dkt. 54.) As a result, the Trustee has not been allowed to take any depositions and the written discovery which has occurred has been limited.

After this case was re-assigned, UBS was granted leave to re-do its summary judgment motion. (Dkt. 92.) UBS's new Motion abandons UBS's original theory that the Bank of New York decision decided the question of Sentinel's intent as a matter of law and instead argues that the Trustee has no evidence that Sentinel paid it with an intent to hinder, delay or defraud its other creditors. (UBS Mem. 10-24.)

**ARGUMENT**

**I.     UBS Has Failed To Demonstrate That There Is No Genuine Dispute About Sentinel's Intent To Hinder, Delay Or Defraud Its Creditors.**

As the party moving for summary judgment, UBS bears the burden of establishing that there are no genuine issues of material fact in dispute that preclude summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). UBS cannot satisfy this burden because the Trustee has presented evidence that the same facts that led the Seventh Circuit to conclude that Sentinel acted with an intent to hinder, delay or defraud creditors when Sentinel transferred certain property to the Bank of New York are also present here. *Sentinel,* 728 F.3d at 666-68.

In *Sentinel*, the Trustee sued the Bank of New York to avoid the Bank's liens on Sentinel's property as actual fraudulent transfers under 11 U.S.C. §548(a)(1)(A). 728 F.3d at 666-68. Following a bench trial, the District Court held that Sentinel did not have an intent to hinder, delay or defraud its creditors when it granted the Bank a lien on cash and securities that Sentinel was legally required to hold in segregation for its customers because Sentinel "schemed to pay" the Bank of New York "to keep its line of credit open presumably in an attempt to stay in business." *Grede v. Bank of N.Y., NA*, 441 B.R. 864, 884 (N.D. Ill. 2010), *rev'd*, 728 F.3d. 660.

On appeal, the Seventh Circuit reversed, holding that the District Court had incorrectly confused the question of Sentinel's motive with its intent. The Seventh Circuit rejected the District Court's conclusion that "such motivation was insufficient to constitute an actual intent to hinder, delay or defraud Sentinel's FCM clients" and held that "[i]n our legal system, 'every person is presumed to intend the natural consequences of his acts.'" 728 F.3d at 667 (quoting *In re Danville Hotel Co.*, 38 F.2d 10, 21 (7th Cir. 1930)). Because "Sentinel exposed its FCM clients to a substantial risk of loss of which they were unaware when it pledged funds that were supposed to remain segregated for the FCM clients as collateral for Sentinel's overnight loans with the Bank

of New York," the Seventh Circuit concluded that Sentinel acted with an intent to hinder, delay or defraud its creditors, regardless of its motivations for doing so. 728 F.3d at 668.

In response to UBS's Motion, the Trustee has presented admissible evidence that the same fact pattern is present here. As set forth in the Trustee's Statement of Additional Facts, when UBS became suspicious of Sentinel's business and demanded the return of its money, Sentinel repaid UBS using someone else's property. (Tr.SOF¶33.) Just as it did when it pledged customer property to secure its Bank of New York loans, Sentinel paid UBS with cash that it was legally obligated to hold in segregation for the benefit of its SEG 3 customers in violation of 17 C.F.R. §275.206. (Tr.SOF¶33.) As a result, Sentinel's SEG 3 accounts—which were already under-segregated by $386.8 million at the time of the transfer to UBS—became even more under-segregated, thereby exposing its SEG 3 customers to a substantial risk of loss. (Tr.SOF¶33.) Under the Seventh Circuit's *Sentinel* decision, Sentinel therefore had an intent to hinder, delay or defraud its SEG 3 creditors when it paid UBS. UBS's Motion, therefore, should be denied.

## II.     UBS's Arguments In Support Of Summary Judgment All Fail.

Incredibly, after initially arguing that the District Court's *Bank of New York* decision conclusively determined the question of Sentinel's intent (Dkt. 33 at 11), UBS now completely ignores the Seventh Circuit's *Sentinel* decision. But that decision establishes a legal standard that is obviously controlling on the Court and the parties and which defeats each of the arguments that UBS makes in support of its Motion.

### A.  The Trustee Has Connected Sentinel's Fraud To The UBS Transfer.

UBS's primary argument is that even if Sentinel was engaged in fraudulent conduct, the Trustee has not connected that fraud to Sentinel's transfer to UBS. (UBS Mem. 10-14.) Relying upon inapposite, out-of-Circuit cases, UBS contends that the only evidence the Trustee has is

19

evidence of a general fraud and that evidence is not sufficient to defeat summary judgment. (*Id*. at 10-11.) But, as set forth above, that is simply not so. The Trustee has connected Sentinel's fraud to the transfer in the same way that Sentinel's fraud was connected to Sentinel's transfers to the Bank of New York. The Trustee has presented evidence that establishes (or at a minimum raises a genuine issue of disputed fact) that Sentinel paid UBS using money that Sentinel was legally required to hold in segregation for creditors other than UBS. (Tr.SOF¶33.) That evidence defeats UBS's Motion.

Moreover, the cases that UBS relies upon to make this argument are distinguishable or actually support the Trustee's position.[4] For example, two of the cases that UBS cites are not actual fraudulent transfer cases; these decisions instead address the question of what constitutes "reasonably equivalent value" which is an element of a constructive fraudulent transfer claim, not an actual fraudulent transfer claim. *Compare* 11 U.S.C. §548(a)(1)(A), *with* §548(a)(1)(B). (UBS Mem. at 11, 14 citing *Daly v. Deptula (In re Carrozzella & Richardson)*, 286 B.R. 480, 488 (D. Conn. 1982) (addressing reasonably equivalent in connection with a constructive fraudulent transfer claim) and *Cox v. Nostaw, Inc. (In re Central Ill. Energy Coop.)*, 521 B.R. 868, 874-75 (Bankr. C.D. Ill. 2014) (same)). *Sentinel* directly contradicts another case that UBS relies upon: *Jeffrey Bigelow Design*, which holds that a debtor's motive is the same as its intent, and thus that decision is not good law in this Circuit in light of Sentinel's holding that motive is not the same as intent. *Compare* 956 F.2d at 484, *with Sentinel*, 728 F.3d at 667-68.

---

[4] It is also significant that many of the cases UBS cites specifically note that intent is a fact issue for trial or are decisions where the question of intent was decided following a trial, a point that UBS ignores. *See, e.g.*, *Kelly v. Armstrong*, 141 F.3d 799, 800 (8th Cir. 1998) (intent determined by jury); *Harman v. First Am. Bank of Md. (In re Jeffrey Bigelow Design Grp.)*, 956 F.2d 479, 481-84 (4th Cir. 1992) (intent decided at trial); *King v. Ionization Int'l, Inc.*, 825 F.2d 1180, 1186 (7th Cir. 1987) (intent is fact issue; case decided following a trial); *Daly v. Kennedy (In re Kennedy)*, 279 B.R. 455, 457 (D. Conn. 2002) (same).

20

*United States v. All Funds on Deposit*, 137 F. Supp. 3d 125, 131 (D. Mass. 2016), is completely distinguishable. In that case, the United States brought a forfeiture action against an individual who had received alleged fraudulent transfers from a company engaged in the criminal distribution of adulterated and misbranded drugs that caused a viral meningitis outbreak. The district court dismissed the government's actual fraudulent transfer claim because the debtor's intent to distribute contaminated drugs was not linked to its intent in making the challenged transfers. *Id*. In contrast, here, Sentinel's unlawful conduct—using SEG 3 customer funds to pay UBS in violation of 17 C.F.R. §275.206—is tied directly to the Trustee's actual fraudulent transfer claim.

Finally, the lone Seventh Circuit case that UBS cites to support its argument—*King,* 825 F.2d 1180—actually supports the Trustee. Both *King* and *Sentinel* stand for the proposition that a transfer of property which prevents creditors from reaching their assets is one which is made with an intent to hinder, delay or defraud creditors. *Id*. at 1186-7; *Sentinel*, 728 F.3d at 668. Wrongfully transferring someone's property to a third party, which is what happened when Sentinel paid UBS, is the very definition of conduct that has the effect of "preventing Sentinel's creditors from their assets." (UBS Mem. 10.) The Court should, therefore, reject UBS's argument that the Trustee has not tied Sentinel's fraudulent intent to its transfer to UBS.

### B. Sentinel's Transfer Of Fictitious Interest To UBS Also Is Connected To Sentinel's Fraud.

UBS argues that it legitimately earned the interest it was paid on its investment and therefore, when Sentinel paid it interest that transfer could not have been connected to Sentinel's fraud. (UBS Mem. 12-14.) But the Trustee has submitted evidence that Sentinel was substantially under-segregated on March 30, 2007 when it allegedly paid UBS interest. (Tr.SOF¶33.) In other words, Sentinel did not have sufficient funds to return all of its customers' initial investments, let

21

alone interest on those investments. Indeed, when it paid UBS "interest" it did so using cash it was holding for SEG 3 creditors, not with interest earned on UBS's investment. Simply put there was no interest to pay UBS.

As the Seventh Circuit explained in *Scholes v. Lehmann,* 56 F.3d 750 (7th Cir. 1995), even if Sentinel had earned some interest on its investments, that fact would not insulate the transfer to UBS from avoidance as a fraudulent transfer given Sentinel's fraud:

> It is no answer that some or for that matter all of [defendant's] profit may have come from "legitimate" trades made by the corporations. They were not legitimate. The money used for the trades came from investors gulled by fraudulent representations. [Defendant] was one of those investors, and it may seem 'only fair' that he should be entitled to the profits on trades made with his money. That would be true as between him and [the owner] or [the owner's] corporations. It is not true as between him and either the creditors of or the other investors in the corporations. He should not be permitted to benefit from a fraud at their expense merely because he was not himself to blame for the fraud. All he is being asked to do is to return the net profits of his investment—the difference between what he put in at the beginning and what he had at the end.

*Id.* at 757-58.

Other courts have reached the same conclusion, holding that when a debtor is engaged in a fraud, that debtor's payments to investors are always made with an intent to hinder, delay or defraud because failure to make the payments "would promptly have resulted in demand, investigation, the filing of a claim and disclosure of the fraud." *Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Grp., LLC),* 439 B.R. 284, 305 (S.D.N.Y. 2010). As explained in *Bayou*:

> It was essential to honor every request for redemption in accordance with the investor's expectation based upon the investor's falsely inflated account statement, because failure to do so would promptly have resulted in demand, investigation, the filing of a claim and disclosure of the fraud. Consequently, every redemption payment *in and of itself* constituted an intentional misrepresentation of fact with respect to the redeeming investor's redemption rights based on the investor's falsely

inflated account statement. Redemption payments consistent with the fraudulent investor account statements were an integral and essential part of the Bayou fraud.

*Id.* (emphasis in original).

So too here. Because Sentinel was illegally commingling customer funds and using the proceeds of that unlawful activity and new investor deposits to pay redeeming customers, every redemption payment *in and of* itself constituted an intentional misrepresentation of fact with respect to the redeeming investor's redemption rights; each redemption is based on the investor's account statements falsely reflecting the segregation of securities for their benefit, and falsely reflecting profits attributable to the customer's account. As the Seventh Circuit held, instead of providing customers "a pro rata share of the interest accrued by securities in their respective pools," as Sentinel promised it would do under its agreements with customers, "Sentinel would [ ] guesstimate the yield its customers expected to receive on their group's securities portfolio, and add a little extra so that the rate of return seemed highly competitive." *FCStone,* 746 F.3d at 248. Thus, the payment of $14 million in fraudulent profits to UBS was, in fact, an "integral and essential part" of Sentinel's fraud. *Id.; see also Johnson v. Neilson (In re Slatkin),* 525 F.3d 805, 814-15 (9th Cir. 2008) (payments to investor of purported but illegitimate profits shown on account statements to investor were made with actual fraudulent intent); *cf. In re Bernard L. Madoff Inv. Sec. LLC,* 654 F.3d 229, 241 (2d Cir. 2011) ("assessing 'net equity' based on . . . customer statements would require the Trustee to establish each claimant's 'net equity' based on a fiction created by the perpetrator of the fraud").

Moreover, whether Sentinel technically was a Ponzi scheme or not (UBS Mem. 12, n.5, 14, 20) has no impact on Sentinel's fraudulent intent. UBS cites a footnote in *Cox v. NOSTAW, Inc. (In re Cent. Ill. Energy Co-op).,* 521 B.R. 868, 875 n.8 (Bankr. C. D. Ill. 2014) (UBS Mem.

23

14), but in *Cox* the court found that the trustee had produced no evidence of actual fraud and had abandoned the claim. A more apt case is *Bayou,* where the district court held:

> Even if the Ponzi scheme presumption were not applicable, the guilty pleas of the Bayou principals combined with the Lenhart Report—which confirms the existence of the fraud scheme and 'establishes that the redemption payments corresponded precisely to the fraudulently inflated account statements for the redeeming investors'—provides overwhelming evidence of actual fraudulent intent. [ ] Moreover, the redemptions were accompanied by multiple "badges of fraud," including fraudulently inflated principal and profits and inadequate consideration.

439 B.R. at 307-08 (*citing In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir.1983)); *Adelphia Recovery Tr. v. Bank of Am.*, 624 F.Supp.2d 292, 335 (S.D.N.Y. 2009). Indeed, even though this Court found that Sentinel was not technically a Ponzi scheme (*Grede*, 441 B.R. at 881-82), the Seventh Circuit nonetheless held that Sentinel's conduct constituted actual fraud. *Sentinel*, 728 F.3d at 667-69.

### C. The Trustee's Expert's Testimony Does Not Support UBS's Summary Judgment Motion.

To escape the fact that there could have been no interest if Sentinel was not holding enough property to pay all of its customers, UBS argues that the Trustee's expert James Feltman admitted in a different case that Sentinel's "interest" payments were legitimate and that this "admission" should bind the Trustee. (UBS Mem. 13-14.) UBS's argument, however, confuses the difference between a judicial admission and an ordinary evidentiary admission. *See Keller v. United States*, 58 F.3d 1194, 1199 (7th Cir. 1995). "Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them. They may not be controverted at trial or on appeal. Indeed, they are 'not evidence at all but rather have the effect of withdrawing a fact from contention.'" *Id*. (citations omitted).

In contrast, a party may explain or controvert an evidentiary admissions. *Id*. Statements an expert makes during his deposition are at most evidentiary admissions and are not judicial admissions. *Bianco v. Hultsteg AB*, No. 05 C 0538, 2009 WL 347002, at *12 (N.D. Ill. Feb. 5,

2009); *accord Sparling v. Doyle*, No. EP-13-CV-00323-DCG, 2016 WL 236266, at *5 (W.D. Tex. Jan. 20, 2016). As one court explained, "the proposition that opinion evidence binds the party that presents it contradicts the principle that a finder of fact is not bound by expert opinion evidence, even when that opinion evidence is uncontradicted." *Long v. Fairbank Farms, Inc.*, No. 1:09-cv-592-GZS, 2011 WL 2516378, at *11 (D. Me. May 31, 2011). Therefore, even if Mr. Feltman had testified that Sentinel's interest calculations were legitimate, that testimony would not bind the Trustee or compel the entry of summary judgment here.

But in fact, UBS has misstated Mr. Feltman's testimony. UBS points to Mr. Feltman's statement that "at the end of the day Sentinel made, in my view, a significant attempt to match the interest accrued and allocated to customer accounts to the actual earnings that the securities would have reflected for those customers." (UBS Mem. 2, 13.) What Mr. Feltman was testifying to was that Sentinel tried really hard to appear legitimate to its customers by crediting their accounts with amounts roughly consistent with the earnings they might have earned had Sentinel *both* segregated their securities *and* actually held sufficient assets to repay everyone.  That is *not* an "admission" that the alleged profits Sentinel credited to customer accounts were not fraudulent.

Indeed, reviewed in context, it is clear that Mr. Feltman's expert opinion was that Sentinel's entire leverage scheme was unlawful, including the interest that was fraudulently calculated and paid to redeeming investors using the profits earned on the entire commingled pool, and that the manner in which Sentinel credited interest was designed to avoid suspicions about its illegal activity. (Tr.SOF¶29.) At trial in the related *FCStone* case, Mr. Feltman testified that: (a) "the interest allocations were items that the company–that the company created and were not derived from the securities that were on that customer statement for that day"; (b) that the interest rates "are what Sentinel thought their customers would expect" and "are estimates"; and (c) that Sentinel

allocated interest from securities that never appeared on customer statements. (Tr.SOF¶29.) After hearing that testimony, the District Court ruled for the Trustee. In short, the testimony that UBS cites from Mr. Feltman's deposition is not an admission and it does not doom the Trustee's case.

### D. Neither The UCC Nor The CEA Provide A Defense To UBS.

UBS argues that because it was "legally entitled" to receive interest under the Uniform Commercial Code, the CEA, and by contract, Sentinel could not have made the transfer with actual fraudulent intent. (UBS Mem. 15-22.) But UBS's purported "legal entitlement" to interest has *nothing* to do with Sentinel's actual fraudulent intent in making the transfer. Just as the Bank of New York was "legally entitled" under its agreements with Sentinel and the Uniform Commercial Code to take a lien on Sentinel's assets, that fact did not prevent the Seventh Circuit from avoiding its liens as actual fraudulent transfers. *Sentinel*, 728 F.3d at 668.

Indeed, the Seventh Circuit and other courts have repeatedly held that "a transfer by a debtor to one creditor, even though for consideration, is still a fraud against other creditors if there is an intent to defraud." *King*, 825 F.2d at 1186; *accord Scholes*, 56 F.3d at 757 (holding that if trustee proves actual intent the transfer is deemed fraudulent "even if it is in exchange for 'valuable' consideration"); *United States v. McCombs*, 30 F.3d 310, 328 (2d Cir. 1994) (same); *In re Equip. Acq. Res., Inc.*, 481 B.R. 422, 428 (Bankr. N.D. Ill. 2012) (same); *In re Roti*, 271 B.R. 281, 302 (Bankr. N.D. Ill. 2002) (same), *aff'd sub nom. Nelmark v. Helms*, No. 02 C 0925, 2003 WL 1089363 (N.D. Ill. Mar. 11, 2003).

The text of §548(a) dictates this result. Section 548(a)(1)(A), as compared to §548(a)(1)(B), makes no mention of the "value" received for the transfer. Therefore "[u]nlike constructively fraudulent transfers [avoided under §548(a)(1)(B)], the adequacy or equivalence of consideration provided for the actually fraudulent transfer is not material to the question whether the transfer is actually fraudulent [and subject to avoidance under §548(a)(1)(A)].'"

26

*H. King & Assocs.*, 295 B.R. at 283 (*quoting In re Cohen*, 199 B.R. 709, 716-17 (B.A.P. 9th Cir. 1996)).

Tellingly, UBS does not cite to a single case which holds that if the transfer is made for consideration, it cannot be an actual fraudulent transfer. Instead, UBS cites *B.E.L.T., Inc. v. Wachovia Corp.*, 403 F.3d 474 (7th Cir. 2005), *Butler v. Loomer (In re Loomer)*, 222 B.R. 618 (Bankr. D. Neb. 1998) and *Carrozzella*, 286 B.R. 480, for the proposition that if a party is legally entitled to receive a transfer in payment of an antecedent debt that payment cannot be an actual fraudulent transfer as a matter of law. (UBS Mem. 15-16, 19-20.) Apart from being flatly contradicted by the Seventh Circuit's decision in *Sentinel*, neither *B.E.L.T.* nor *Loomer* nor *Carrozzella* actually stand for that proposition.

In *B.E.L.T.*, the Seventh Circuit held, consistent with *Sentinel* and *Scholes*, that the transferee's "provision of 'reasonably equivalent value' prevents calling a transfer a fraudulent conveyance *unless that transfer occurred 'with actual intent to hinder, delay, or defraud any creditor of the debtor*.'" *Id*. at 478 (internal citations omitted) (emphasis added). In other words, if the debtor had an actual fraudulent intent, the fact that the transferee was repaying an antecedent debt does not prevent a trustee from avoiding the transfer under §548(a)(1)(A) as an actual fraudulent transfer. Moreover, in affirming the district court's dismissal of the complaint, the Seventh Circuit in *B.E.L.T.* did not foreclose the possibility of an actual fraudulent transfer claim being made on the facts of that case; "[r]ather, the panel found that there simply were not enough facts" pled in the complaint to support such a claim. *Equip. Acq. Res.,* 481 B.R. at 428 (distinguishing *B.E.L.T.*); *accord In re Petters Co., Inc.*, 499 B.R. 342, 350-52 (Bankr. D. Minn. 2013) (distinguishing *B.E.L.T.* and noting that if the debtor had an actual intent to hinder delay or

defraud creditors it does not matter if the transferee "nominally received its due in payment on a contract that was regular on its face").

*Loomer* is an out-of-Circuit, lower court case and it does not involve a debtor engaged in fraud. In that case, the trustee sought to avoid transfers a debtor made to his retirement plan in repayment of a loan from that plan. The bankruptcy court found, after a trial, that the debtor did not have an intent to hinder, delay or defraud his creditors in repaying the loan; the bankruptcy court did not hold that transfers made for consideration are *per se* never actual fraudulent transfers. 222 B .R. at 622-23.

*Carrozzella* is not an actual fraudulent transfer case. The issue in that case was whether a debtor's payment of interest to investors in a fraud scheme could be avoided as a *constructive* fraudulent transfer; in other words whether the payment of interest in a fraud scheme can ever constitute reasonably equivalent value. 286 B.R. at 482, 487. The district court held in *Carrozzella* that the payment of interest did constitute reasonably equivelent value, a holding the court acknowledged was at odds with decisions, like this Circuit's decision in *Scholes*, 56 F.3d at 757-58, which reached the contrary conclusion. 286 B.R. at 487. Thus, in addition to not addressing the type of claim present in this case, *Carrozzella* also is not good law in this Circuit.[5]

Finally, to the extent that UBS is suggesting that the UCC or the CEA block the ability of a trustee to bring an actual fraudulent transfer claim (UBS Mem. 15-19), they have cited no authority for this novel argument, and none exists. The case law holds otherwise. As a bankruptcy court in this District explained, the "only" defense available to an initial transferee of a fraudulent

---

[5] It also is significant that numerous courts have distinguished *Carrozzella* in circumstances, like here, where fictitious profits were gamed to track actual securities or otherwise invented. *See Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 476 B.R. 715, 726 (S.D.N.Y. 2012), *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411 (2d Cir. 2014); *In re Bayou Grp., LLC*, 439 B.R. 284, 337 (S.D.N.Y. 2010).

28

transfer is the good faith for value defense set forth in §548(c). *In re Roti*, 271 B.R. 281, 295 (Bankr. N.D. Ill. 2002). Simply put, "courts do not recognize state law equitable defenses to actions to avoid preferential transfers under §547 and fraudulent transfers under §548." *Gecker v. Goldman Sachs & Co. (In re Auto. Prof'l's Inc.)*, 398 B.R. 256, 262 (Bankr. N.D. Ill. 2008). Indeed, a case cited by UBS, *Petters* (UBS Mem. 12), makes this point clear: "It matters not whether the transferee nominally received its due in payment on a contract that was regular on its face, or even one fully-enforceable under state law. *Id.* at 351. Thus, whether UBS was entitled to the funds Sentinel transferred to it under otherwise applicable law or its contract is entirely irrelevant.

UBS's contrary argument is not saved by *Butner v. United States,* 440 U.S. 48, 55 (1979). *Butner* stands for the general and unremarkable proposition that state law defines creditors' claims against a bankruptcy estate. (UBS Mem. 15.) As the Seventh Circuit has held, however, even though state law defines property rights, when a specific provision of the Bankruptcy Code establishes the cause of action, the action is a federal claim decided by federal law. *See, e.g.*, *In re Marrs-Winn Co.*, 103 F.3d 584, 591 (7th Cir. 1996) ("[t]he question of whether a debtor's interest in property is 'property of the estate' [under §541] is a federal question to be decided by federal law" even if "courts must look to the applicable state law to determine the extent (if any) of the Debtor's legal or equitable interest in the property"). Neither the UCC nor the CEA block the Trustee from proceeding on his actual fraudulent transfer claim.

### E. The Trustee Is Not Judicially Or Collaterally Estopped By The Plan.

Finally, UBS argues that the Trustee should be estopped from avoiding the transfers Sentinel made to UBS because he allegedly asserted (and the Bankruptcy Court found) at the Plan confirmation hearing that customer claims must include accrued interest. (UBS Mem. 22-24.) This argument is incorrect at least four reasons.

*First*, UBS misstates the Plan's terms. The Plan uses customer account balances (which include purportedly accrued interest) for three very limited purposes: (i) to determine "Percentage Recoveries" (*i.e.* to compare amounts customers already received in order to determine whether they are entitled to further distributions), (ii) to make *initial* distributions to creditors, and (iii) to calculate the Plan reserves. The Plan provides:

> *For purposes of calculating Adjusted Percentage Recoveries and Percentage Recoveries, and for purposes of making Initial Distributions and establishing reserves,* each Class 3 Customer Claim shall equal the amount listed as "Net Equity" on such Holder's Customer Account Statements dated August 13, 2007….

(Bankr. Dkt. 1241, §4.4 (emphasis supplied).) However, both the Plan and the Bankruptcy Court's Memorandum Opinion confirming the Plan recognize that claims still must be "allowed" in order to receive subsequent distributions. Plan, §4.5(a), (b); *In re Sentinel Mgmt. Grp., Inc.,* 398 B.R. 281, 291 (Bankr. N.D. Ill. 2008) ("The Plan provides for distributions to creditors on the effective date or as soon thereafter as practicable. Additionally, *allowed claimants* will receive distributions at several intervals after the initial distributions." (emphasis added)). Nowhere did the Plan dictate that an "allowed claim" must include or exclude purportedly accrued interest.

*Second*, UBS's brief mischaracterizes the nature of the debate at the Plan confirmation hearing. As explained in the Court-approved disclosure statement, the dispute centered on whether customer claims should be based on amounts invested (described in the disclosure statement as the "'net investment' (cash deposits less cash withdrawals)" methodology), as opposed to a "'net equity' (hypothetical liquidation value of the securities allocated to a Customer by Sentinel)" methodology being advanced by SEG 1 customers. (*See* Bankr. Dkt. 592 at 30-31.) The Trustee posited that the latter would have unfairly punished customers to whose accounts illiquid and valueless securities unlawfully had been allocated; the Bankruptcy Court adopted the Trustee's position. *Sentinel*, 398 B.R. at 310-314. That debate had nothing to do with whether purportedly

accrued interest should be included, and there certainly was no judicial determination that allowed claims must include both principal and purportedly accrued interest.

Even in the limited instances where the Plan uses account balances (including accrued interest), those reference points were not selected because the interest claims were legitimate; rather, that methodology was used simply because it was the most expedient and cost-effective method to make initial distributions to harmed customers and to create reserves:

> [A]s tested by the Plan Proponents over the three and a half year period of time preceding the Petition Date, the notional value that Sentinel reported to Sentinel's Customers on its monthly account statements closely approximated Customers' "net investment" Claim measured over the same period…. Given the proximity of the amount reported to Customers by Sentinel on their customer statements to their actual "net investment" (when provision is made for time value of money), and due to the unreliable and incomplete nature of Sentinel's books and records (which would obfuscate any attempt to arrive at a perfectly accurate measurement of "net investment"), the Plan Proponents believe that the amount reported by Sentinel on Customers' account statement is in fact the most efficient, equitable method to calculate Customer Claims.

(Disclosure Statement, Bankr. Dkt. 592 at 31.)

*Third*, no Plan sponsor asserted that purportedly accrued interest was a legitimate component of allowed customer claims. UBS picks a snippet from the Trustee's testimony at the Plan confirmation hearing to prop up its argument, but reviewed in context it is clear that the Trustee's testimony only addressed the "net investment" versus "net equity" issue, and that there was *no* testimony stating that accrued interest represented a legitimate claim. (Tr.SOF¶35.) No Plan sponsor advocated that accrued fictitious interest must be a component of allowed customer claims, or even that the account statements were legitimate. (Tr.SOF¶35.) In fact, the Trustee's counsel stated "[We] are talking about treating everybody equally, we are talking about the amount that they put into the plan or they put into Sentinel…. We are not talking about respecting the account statements that were completely fraudulent, that everyone in this courtroom knows were completely fraudulent…. These are made up." (Tr.SOF¶35.)

*Finally,* even if UBS's flawed Plan interpretation were to be adopted, it would not be incongruous to include accrued interest as part of a customer's allowed claim, on the one hand, and to still claw back payments previously made to that customer, on the other. Virtually all of the Sentinel avoidance litigation involves legitimate debts. For example, no one disputes that the Bank of New York actually lent more than $300 million to Sentinel, or that the SEG 1 defendants do not have legitimate claims. The fact that a creditor is owed a legitimate debt, however, has nothing to do with whether Sentinel had an actual intent to hinder, delay or defraud its creditors when it made that transfer.

## CONCLUSION

For all of the foregoing reasons, the Court should deny UBS's Motion for Summary Judgment and grant such other relief as may be just.

Dated:   July 28, 2017

Respectfully submitted,

FREDERICK J. GREDE, not individually but as Liquidation Trustee of the Sentinel Liquidation Trust

By: */s/ Catherine Steege*
One of his attorneys

Catherine Steege (ARDC # 6183529)
Vincent E. Lazar (ARDC # 6204916)
Angela M. Allen (ARDC #6295519)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Phone: (312) 222-9350

*Counsel for the Liquidation Trustee*

32

## <u>CERTIFICATE OF SERVICE</u>

I, Angela M. Allen, an attorney, certify that on June 28, 2017, I caused a copy of the **TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**, to be served by ECF Notification upon:

**<u>VIA ECF NOTIFICATION</u>:**

- **Stephen Patrick Bedell**
  sbedell@foley.com
- **Robert S. Bressler**
  rbressler@foley.com
- **Michael K. Desmond**
  mdesmond@fslegal.com
- **Geoffrey S Goodman**
  ggoodman@foley.com,dnichols@foley.com
- **Thomas Paul Krebs**
  tkrebs@foley.com,chillmert@foley.com


*/s/ Angela M. Allen*
Angela M. Allen