**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **FREDERICK J. GREDE, not individually,** | ) | |
| **but as Liquidation Trustee and** | ) | |
| **Representative of the Estate of Sentinel** | ) | |
| **Management Group,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | No.  09 C 5880 |
| | ) | |
| **UBS SECURITIES, LLC** | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

The short-term cash management firm Sentinel Management Group, Inc. collapsed and filed for bankruptcy in August 2007 at the outset of the financial crisis.  Required by federal law to segregate its clients' funds and invest in only the highest grade government securities, Sentinel instead pledged the securities in its clients' accounts as collateral for loans from the Bank of New York—which Sentinel then used to buy even more securities on its own "House" account for the benefit of corporate insiders.  As credit markets tightened in the summer of 2007, Sentinel found itself unable to both repay the Bank's loan and return its clients' money on demand.  All told, Sentinel cost its investors more than $600 million.  *See United States v. Bloom*, 846 F.3d 243, 245–46 (7th Cir. 2017) (affirming Sentinel CEO Eric Bloom's convictions on nineteen counts of wire fraud and investment advisor fraud).  Dozens of lawsuits were filed in the wake of Sentinel's failure.  Many are ongoing to this day.

Defendant UBS Securities, LLC is a former customer of Sentinel.  In March 2007, Sentinel transferred $108 million to UBS, which included $14.4 million characterized as "cumulative interest."  (UBS Securities, LLC's Memorandum in Support of its Motion for Summary Judgment [97] ("UBS's Opening Br."), 1.)  The Plaintiff in this case, Frederick J. Grede, is the Liquidation Trustee for the Sentinel Liquidation Trust.  The Trustee claims that

Sentinel acted with actual "intent to hinder, delay, and defraud" its other creditors when making the pre-petition transfer to UBS, and argues that the cumulative interest payment represents "false profits." (Complaint [1] in No. 09-BR-521, 18–19) (citing 11 U.S.C. § 548(a)(1)(A)). Accordingly, the Trustee seeks to avoid the transfer and return the $14.4 million to the Liquidation Trust. UBS has moved for summary judgment, arguing that the Trustee has alleged only a "general scheme to defraud," and not fraudulent intent with respect to the specific transfer at issue. (UBS's Opening Br. 2.) UBS asserts that the cumulative interest was "neither 'false' nor 'profits,'" but rather the proceeds of Sentinel's legitimate investment activity—which Sentinel properly paid to UBS in fulfillment of its legal and contractual obligations. (*Id.*)

For the reasons stated below, the Defendant's motion for summary judgment [96] is granted.

## FACTUAL BACKGROUND

**1.      Overview of Sentinel's Business and Bankruptcy**

Sentinel Management Group, Inc. was an Illinois corporation that provided cash-management services for institutional investors, hedge funds, and individuals. (UBS Securities LLC's Local Rule 56.1 Statement of Uncontested Material Facts [98] ("UBS SoF"), ¶ 3.) Its primary business consisted of making safe, short-term investments of the excess cash held by other investment firms called futures commission merchants ("FCMs")—brokers that execute trades in the futures and options markets and that are regulated by the Commodity Futures Trading Commission ("CFTC"). (*Id.*) Although Sentinel did not itself execute futures or options trades, it too was registered as an FCM with the CFTC as a prerequisite for managing the funds of typical FCMs. (*Id.*); *see also Bloom*, 846 F.3d at 246 (describing Sentinel's business model as "unique" and operating "like a mutual fund, pa[ying] a return based on profits and losses.") Importantly, this meant that Sentinel was governed by the same securities law and regulations as its clients. (UBS's SoF ¶ 4.) These regulations required Sentinel to maintain its clients' funds in segregated accounts, and limited Sentinel's use of those funds to "investments [in]

2

certain high-quality government and corporate securities" such as U.S. Treasury bills.  (*Id.* at ¶¶ 9–10) (citing 7 U.S.C. § 6d(b) and 17 C.F.R. § 1.25).

Sentinel offered a variety of investment programs to account for different investment objectives and to comply with various regulations, but ultimately pooled all of its clients' assets into one of three distinct groups.  (UBS's SoF ¶ 10)  Sentinel called these groups SEG 1, SEG 2, and SEG 3.  (*Id.*)  When advertising its investment options to potential customers, Sentinel referred to the SEG 1 group as the "125 Portfolio" (named after CFTC Rule 1.25) and the SEG 3 group as the "Prime Portfolio."  *Bloom*, 846 F.3d at 247.  SEG 1 was more conservative and intended for FCMs investing their own customers' funds, while SEG 3 offered a higher rate of return at slightly greater risk and was open to Sentinel's non-FCM clients: hedge funds, individuals, and FCMs investing their proprietary, non-customer funds.[1]  *Id.*  Clients who invested money into one or more SEGs were promised "an undivided, pro-rata beneficial interest in the pool of securities" purchased using the funds within each SEG.  (UBS's SoF ¶ 12.)  This meant that Sentinel's investors did not own specific securities outright, but saw their funds "exchanged for securities and interest-bearing cash through a process that Sentinel called 'allocation'" and instead held indirect shares of their respective SEG based on their level of investment.  *Grede v. FCStone, LLC*, 867 F.3d 767, 771 (7th Cir. 2017) ("*FCStone II*").

In addition to making trades for its clients, Sentinel also traded on its own "House" account for the benefit of corporate insiders, which included the chairman, Philip Bloom; the CEO, Eric Bloom (Philip's son); and the vice president of trading, Charles Mosley.  (Trustee's Statement of Additional Material Facts in Opposition to UBS's SoF [112] ("Trustee's SoAF"), ¶ 4.)  Sentinel's House account was not constrained by the laws and regulations that governed the grade and risk of investments within the customer SEGs.  *Bloom*, 846 F.3d at 247.  Federal law, federal regulations, and Sentinel's client agreements did, however, require all client funds

---

[1]  SEG 2 consisted of funds derived from FCM clients' trades on foreign futures and foreign options markets.  (Trustee's Statement of Additional Material Facts in Opposition to UBS's SoF [112] ("Trustee's SoAF"), ¶ 3.)  SEG 2 funds are not at issue in this dispute.

to be segregated from each other as well from Sentinel's House funds. (UBS's SoF ¶ 9) (citing 7 U.S.C. §§ 6d(a) and 6d(b); 17 C.F.R. §§ 1.3(gg), 1.20, 1.25, and 1.26(a)).

As has been well documented in more than a dozen published and unpublished opinions dating back to 2009, Sentinel failed to abide by these rules.[2] In 1997, Sentinel opened up a line of credit—called the "overnight loan"—with the Bank of New York for the purpose of providing liquidity for customer redemptions and failed trades. *In re Sentinel Management Group, Inc.,* 728 F.3d 660, 663–64 (7th Cir. 2013) ("*BONY I*"); (Trustee's SoAF ¶ 11). Although Sentinel at certain points held well over $1 billion in customer assets, it kept very little cash on hand—never more than $3 million. *BONY I*, 728 F.3d at 663; (Trustee's SoAF ¶ 12). This overnight loan from the Bank of New York allowed Sentinel to pay its redeeming clients in cash immediately, rather than after waiting for specific securities to sell. *BONY I*, 728 F.3d at 664; (*see also* Expert Report of Frances M. McCloskey ("McCloskey Rep."), ¶¶ 64–67, Ex. 2 to UBS Securities, LLC's Response to Trustee's SoAF [121-2] ("UBS's Resp. to Trustee's SoAF").) As acknowledged by the Seventh Circuit, the original overnight loan arrangement "did not violate segregation requirements[:] When a customer cashed out, the amount needed in segregation dropped by the amount lent by the Bank via the line of credit." *BONY I*, 728 F.3d at 664.

Sentinel maintained two types of accounts with the Bank of New York to facilitate this arrangement: segregated accounts and non-segregated accounts. Nine segregated accounts held different asset classes—cash, government securities, and DTC (corporate) securities[3]—for each of SEGs 1, 2, and 3. (Trustee's SoAF ¶ 8.) The four non-segregated accounts included Sentinel's House cash account, as well as several clearing accounts through which Sentinel

---

[2]    *See, e.g., SEC v. Sentinel Management Group, Inc.*, No. 07-CV-4684, 2012 WL 1079961, at *1 (N.D. Ill. Mar. 30, 2012) (granting summary judgment for the SEC in its civil enforcement action against Sentinel's Vice President Charles Mosley); *In re Sentinel Management Group, Inc.*, 809 F.3d 958, 964 (7th Cir. 2016) ("*BONY II*") (holding that BONY was on inquiry notice of Sentinel's fraud and had received avoidable fraudulent transfers); *Bloom*, 846 F.3d at 245–46 (affirming Sentinel CEO Eric Bloom's fraud convictions).

[3]    The DTC or "Depository Trust Company" is a securities depository used for clearing corporate-issued securities in the United States. (McCloskey Rep. ¶ 42.)

bought, sold, and transferred securities. (*Id.* at ¶ 9.) Sentinel also maintained six additional segregated accounts for holding clients' cash at JP Morgan, which will be discussed further below. (*Id.* at ¶ 10.)

Sentinel's primary clearing accounts at the Bank of New York were called the "SEN account" and the "SLM account." (*Id.* at ¶ 9.) These two accounts operated together to clear transactions and to secure the overnight loan from the Bank. (McCloskey Rep. ¶¶ 64–67.) The SEN account was the clearing account and only held securities or cash during the day. Every evening, Sentinel would zero out the SEN account and transfer securities to the night-time SLM account to secure the overnight loan. At some point, however, Sentinel began securing the overnight loan using the assets in all of the non-segregated accounts, not just the overnight SLM account.[4] *BONY I*, 728 F.3d at 663.

Sentinel's actual use of the overnight loan and its customers' funds bore little resemblance to their purported uses. *Bloom*, 846 F.3d at 248. Instead of merely facilitating day-to-day liquidity, Sentinel used the overnight loan to purchase "risky securities that did not comply with customers' investment portfolio guidelines." *Grede v. FCStone, LLC*, 746 F.3d 244, 248 (7th Cir. 2014) ("*FCStone I*"). Most importantly, beginning in 2001 and increasingly by 2004, Sentinel's management started using the proceeds of the overnight loan "to fund its own proprietary repurchase arrangements." *BONY I*, 728 F.3d at 664. Repurchase arrangements, or "repos," are transactions in which one party sells a security to another party with an agreement to repurchase the security later, with interest—effectively, another loan with the security acting as collateral.[5] *Bloom*, 846 F.3d at 248–49 ("The goal was to earn enough

---

[4]   UBS asserts that only the SLM account was used to secure the overnight loan (*see* UBS's Resp to Trustee's SoAF ¶¶ 9, 11), but UBS's own evidence does not support its claim. (See 5/17/06 NFA Audit Memo ("May 2006 NFA Audit"), 5, Ex. 16 to UBS's Resp. to Trustee's SoAF [122-2]) ("[P]er Bloom, NFA noted that SEN can also be used as lien account.")

[5]   A "repo" is the transaction viewed from the seller's perspective, while a "reverse repo" is the same transaction from the viewpoint of the buyer. "Sentinel was involved in both ends of these transactions: sometimes it used its customers' cash to purchase securities,

income from the additional investments to beat the cost of borrowing. This came with risks.")
Sentinel's habit of funding repos with the Bank of New York's loan resulted in highly leveraged
portfolio. *Id.* If (and when) the stock market eventually turned, Sentinel would face losses from
both the depreciation of its assets and the cost of borrowing. As described by the Seventh
Circuit Court of Appeals in a related case:

> Sentinel routinely used hundreds of millions of dollars in securities it had
> allocated to customers as collateral to support Sentinel's own borrowing to
> pursue its leveraged trading strategy for its own benefit. It moved those
> securities out of segregation and into a lienable account at the Bank of New
> York, its main lender, putting customer property at risk for Sentinel's benefit. As
> Sentinel's leveraged trading increased, its outstanding debt ballooned, and it
> drew more and more on its customers' assets to support its borrowing habit.

*FCStone II*, 867 F.3d at 772; *see also Bloom*, 846 F.3d at 249–50. The Seventh Circuit called
this practice "a flagrant violation of both SEC and CFTC requirements" which left both SEG 1
and SEG 3 "chronically underfunded." *FCStone I*, 746 F.3d at 248. Sentinel's customers
remained unaware of these machinations, as "securities that were serving as collateral for the
BONY loan continued to appear on customer statements as if they were being held in
segregated accounts for their benefit even though Sentinel was routinely removing them from
those accounts." *Id.*

"By the summer of 2007, Sentinel no longer slouched toward bankruptcy; it careened."
*Bloom*, 846 F.3d at 249. The crisis in the subprime mortgage industry spread to the economy
as whole, and Sentinel's repo counterparties reacted by pushing their now-worthless securities
back onto Sentinel. In June and July 2007, two of Sentinel's largest repo counterparties
returned more than $400 million worth of securities to Sentinel, which forced Sentinel to borrow
more heavily from the Bank of New York to compensate—always using its customers' property
as collateral. *Id.*; *FCStone II*, 867 F.3d at 772. As the summer went on, Sentinel found itself
unable to keep up with its customers' redemption requests and BONY's demand for collateral to

---

earning interest when it resold the security (lending); other times Sentinel sold securities to
obtain cash quickly, repurchasing the security and paying interest afterwards (borrowing)."
*Bloom*, 846 F.3d at 248.

secure the loan.  *Id.*.  On August 17, 2007, Sentinel filed for Chapter 11 bankruptcy protection.  Sentinel had by then lost more than $600 million of its clients' money, and owed BONY in particular $313 million it had secured with client property.  *Bloom*, 846 F.3d at 245–49.

## 2.  Fraudulent Interest Calculations

On top of the segregation violations, Sentinel's officers misbehaved in an additional way: by falsifying the interest earned on the investments in its customers' accounts.  Sentinel's marketing materials stated that investors "would receive interest based on a *pro rata* share of the interest earned only on the securities appearing on their daily customer statements." (Trustee's SoAF ¶ 28); *see also Bloom*, 846 F.3d at 248.  Customers were also assured that there would be "no allocation of profits and losses across the different 'Seg' accounts."  *Bloom*, 846 F.3d at 248.  Sentinel did not keep its word.  Instead:

> Sentinel [ ] would calculate the interest earned by *all* securities, including those belonging to other Segments and the house pool.  Sentinel would then guesstimate the yield its customers expected to receive on their group's securities portfolio, add a little extra so that the rate of return seemed highly competitive, and report the customer's *pro rata* share of that amount, minus fees, on the customer's statement.

*FCStone I*, 746 F.3d at 248 (emphasis in original).  The Trustee alleges also that, in addition to falsifying the interest credited to each of the SEGs, "Sentinel's insiders kept for themselves a substantial portion of the interest yield accruing on Sentinel's overall securities portfolio." (Trustee's SoAF ¶ 28; 1/15/10 Expert Report of James S. Feltman ("2010 BONY Feltman Rep."), ¶¶ 64–68., Ex. 1.B. to Trustee's SoAF [112-1].)

Sentinel's misleading method of reporting interest has been widely criticized in other lawsuits arising from Sentinel's bankruptcy, on the same bases that the Trustee now cites in opposition to UBS's motion for summary judgment.  (*See* Trustee's SoAF ¶ 28; 2/8/13 Omnibus Expert Report of James S. Feltman ("2013 Omnibus Feltman Rep."), ¶¶ 90–96, Ex. 1.A. to Trustee's SoAF [112-1].)  One of the Trustee's expert witnesses, James Feltman, reviewed selected customer accounts from 2005 to 2007, and concluded that "Sentinel allocated interest

income to customers by groups at a rate of return that they made up, and which they expected would approximate the amount earned by securities reportedly held in each customer's account." (2013 Omnibus Feltman Rep. ¶ 96.)

During the SEC's civil enforcement case against Sentinel and its officers, VP Charles Mosley conceded the same point. *SEC v. Sentinel Management Group, Inc.*, No. 07-CV-4684, 2012 WL 1079961, at *16 (N.D. Ill. Mar. 30, 2012) (Kocoras, J.). "Mosley admitted that Sentinel would pool the interest generated by the various portfolios, including the House Portfolio, and distribute that interest across the investors' portfolios[, and] further admitted that the interest distributed to investors bore no relation to the interest that the investors' securities had actually accrued." *Id.* Judge Kocoras granted the SEC's motion for summary judgment based on this admission, finding that Mosley violated sections 17(a)(1)–(3) of the Securities Act, 15 U.S.C. § 77a *et seq.*, because he "actively and knowingly participated in Sentinel's scheme to defraud its investors, obtained money by means of Sentinel's misrepresentations, and engaged in a course of fraudulent business." *Id.*

The same evidence supported Eric Bloom's criminal conviction. On January 19, 2017, the Seventh Circuit affirmed Bloom's convictions on eighteen counts of wire fraud and one count of investment fraud. *Bloom*, 846 F.3d at 246. The Court of Appeals concluded that the evidence was sufficient to support the jury's guilty verdict against Bloom on the allegation that he employed "a scheme to manipulate client yield rates by reallocating interest . . . in an effort to make the 125 Portfolio seem more lucrative that it was[.]" *Id.* at 250. The Trustee highlights *United States v. Bloom*, 846 F.3d 243 (7th Cir. 2017), as particularly relevant to UBS's situation due to the effect Bloom's yield manipulation had on SEG 1:

> Sentinel used the yields from the house account and the Prime Portfolio [i.e., SEG 3] to inflate artificially the returns from the 125 Portfolio [i.e., SEG 1]. Sentinel's high-risk trading in the house account generated higher returns than the more conservative 125 Portfolio. The Prime Portfolio, which was slightly riskier than the 125 Portfolio, likewise generated higher returns. Sentinel redistributed some of these returns from the house account and the Prime Portfolio to the 125 Portfolio, effectively using the riskier accounts to subsidize

the more conservative account. With these inflated rates of return in the 125 Portfolio, Sentinel could attract new clients by outperforming its competition. Indeed, it advertised these rates in its marketing material and on its website.

Sentinel employees testified that they doctored the yield rates on a daily basis from 2004 until the company's bankruptcy in 2007. Instead of paying customers the interest they actually earned, Sentinel employees divvied up interest payments according to the instruction of Bloom or Charles Mosley. Bloom in fact created a spreadsheet to help employees calculate how to redistribute funds, which was called the "Daily Yield/Rate Calculation." The spreadsheet listed both the actual interest earned by customers' securities and the rate set by Sentinel.

The rate setting often favored the customers in "Seg 1" (125 Portfolio). For example, on December 7, 2006, the interest actually earned by Seg 1 was $96,942.63. After the rate manipulation by Sentinel, that portfolio was allocated $103,832.46. On that same day, Seg 3 (Prime Portfolio) actually earned $148,005.09 in interest and the house account earned $17,949.85. After Sentinel's rate adjustment, Seg 3 customers were paid just $112,657.32 and the house account received $49.11.

. . . [O]n July 30, 2007, Bloom spoke with an employee who was setting the rates and agreed to inflate the 125 Portfolio to keep it competitive. At the end of that day, Seg 1 actually earned $63,477.53, but was paid $100,420.34 using the interest earned by customers in Seg 3 and by the house account. Another employee testified that he raised the matter with Bloom before May 15, 2007, and Bloom acknowledged that Seg 3 and the house account supplemented Seg 1.

(Trustee's Memorandum of Law in Opposition to UBS's Opening Br. [111] ("Trustee's Resp. Br."), 12) (quoting *Bloom*, 846 F.3d at 252.)

The Trustee has not submitted evidence regarding the specific securities that Defendant UBS was supposed to be earning interest on, nor on the exact difference between the interest UBS was allegedly overpaid and the "real" interest rate. Instead, the Trustee argues that because Sentinel was "substantially undersegregated" when it paid the $14.4 million in cumulative interest to UBS on March 30, 2007, it "did not have sufficient funds to return all of its customers' initial investments, let alone interest on those investments." (Trustee's Resp. Br. 21–22.) "Simply put," the Trustee asserts, "there was no interest to pay UBS," and the entire $14.4 million therefore constitutes "false profits." (*Id.*; *see also* Complaint 18–19.)

UBS challenges this characterization of the interest earned on its SEG 1 account. (UBS's Opening Br. 8.) At the very least, UBS contends that the Trustee cannot possibly prove

his blanket denial of the cumulative interest's legitimacy: "the Trustee has failed to plead or show any facts about the specific amount of alleged 'false profits' transferred to UBS on each of the hundreds of days that UBS invested customer funds in Sentinel." (*Id.* at 12.) In a related dispute, *Grede v. FCStone, LLC*, No. 09-CV-136 (the "*FCStone* test case"), UBS's expert Frances McCloskey concluded that Sentinel acted appropriately when paying interest to its customers. (McCloskey Rep. ¶¶ 273–277.) McCloskey's "analysis of the securities' yields and returns paid to customers revealed that returns from securities on customer statements provided the overwhelming majority of the return paid to customers, but that customer returns in most groups were supplemented in small amounts by Sentinel's House repo portfolio." (*Id.* at ¶ 274.) McCloskey found no instance in which Sentinel redirected returns from one SEG to another, rather than from Sentinel's own funds to the customer SEGs. (*Id.*) McCloskey also repeatedly emphasizes that "Sentinel does not display any of the characteristics that define a Ponzi or Ponzi-like scheme," but was "engaged in a legitimate business [ ] providing investment management to its customers." (*Id.* at ¶¶ 269–272.)

UBS also argues that the Trustee himself has conceded the legitimacy of the cumulative interest through earlier testimony from its expert James Feltman. (*Id.* at 12–14.) During his deposition in the *FCStone* test case, Feltman testified as follows:

> Question: Was there anything improper with Sentinel accruing interest and allocating it to customers on a daily basis?
> . . .
>
> FELTMAN: Not from the standpoint of the process. The actual procedure that Sentinel used or the procedure that Sentinel used incorporated examining the entire portfolio of securities it held including interest on repos and taking into account the daily interest charges on the loan and putting that into the overall calculus on a gross and net basis, but **at the end of the day Sentinel made, in my view, a significant attempt to match the interest accrued and allocated to customer accounts to the actual earnings that the securities would have reflected for those customers.**

(Dep. of James Feltman in *Grede v. FCStone, LLC*, No. 09-CV-136 ("*FCStone* Feltman Dep."), at 219:4–20, Ex. 22 to UBS's SoF [98-22].) Feltman stood by that conclusion when he testified at the *FCStone* trial. (UBS's SoF ¶ 30.)

The Trustee contends that this quotation was taken out of context, and that Feltman's deposition taken as a whole supports the position he took in his reports: that "interest was fraudulently calculated and paid using the profits on the entire comingled pool, and that the manner in which Sentinel credited interest was designed to avoid suspicions about its illegal activity." (Trustee's Resp. Br. 13.) Immediately after making the statement quoted above, Feltman pointed out that "to the extent that withdrawals included interest earned by a customer, the actual payment of interest was made with comingled funds" because those funds were repeatedly routed into and through the SEN clearing account. (*FCStone* Feltman Dep. 222:4–10) (discussing proof 14 of the 2013 Omnibus Feltman Report which states: "Interest income was paid to customers with cash from the comingled [SEN account] or other customers' deposits." *Id.* at 55.) The Trustee also notes Feltman's testimony in the *FCStone* bench trial. When asked about the interest payments, Feltman stated: "I [ ] concluded that that the interest allocations were items that the company . . . created and were not derived from the securities that were on that customer statement for the day"; "they're estimates[,] . . . what Sentinel thought their customers would expect"; and that Sentinel allocated interest from the whole pool, not the securities identified on customer statements. (*FCStone* Trial Tr. 581:5–8, 589:10–12, 591:13–19.) The Trustee concludes that the portion of Feltman's deposition testimony offered by UBS merely shows "that Sentinel tried really hard to appear legitimate"—not that the alleged profits were not fraudulent. (Trustee's Resp. Br. 25.)

### 3. UBS's Relationship with Sentinel and the March 2007 Transfer

Unlike many of Sentinel's clients, UBS managed to withdraw its entire position in SEG 1 well ahead of Sentinel's collapse. The Trustee filed numerous avoidance actions against other SEG 1 investors who received funds on the days immediately surrounding Sentinel's

bankruptcy, *see e.g. FCStone I*, 746 F.3d at 252–54 (holding that various pre- and post-petition transfers were not avoidable); however, those transfers bear little resemblance to the one at issue here.

UBS's predecessor, ABN AMRO, Inc., had invested funds with Sentinel since 2000. (UBS's SoF ¶ 11.) UBS acquired ABN AMRO's interest in Sentinel on September 30, 2016. (*Id.* at ¶ 16.) For the duration of its relationship with Sentinel, UBS was assigned to Group 7 of Sentinel's SEG 1 portfolio. (*Id.* at ¶ 19.) Like that of all Sentinel's clients, UBS's position was governed by an Investment Agreement that authorized Sentinel to purchase and sell securities for UBS's account and required Sentinel to hold those assets in segregation. (*Id.* at ¶ 11.) Under the terms of the Investment Agreement, UBS was entitled to redeem its investment at any time. (*Id.* at ¶ 14) (citing Investment Agreement § 4(b), Ex. 4.A. to UBS's SoF [98-4].)

On March 13, 2007—roughly six months after UBS acquired ABN AMRO's interest in SEG 1—several UBS employees circulated an e-mail among themselves which contained internal analyses showing that UBS's investments with Sentinel were earning the highest monthly interest rate among five firms with which UBS had placed investments. (Ex. 40, E-mail from William Frothingham to Robert Gaffney, et. al., of 3/13/07, Ex. 40 to Trustee's SoAF [112-42]; UBS Investment Analyses, Ex. 41 to Trustee's SoAF [112-43].) Two weeks later, on March 28, 2007, UBS employee Gregory Hardiman called Sentinel's Sales Manager, Steven Stitle, to discuss pulling UBS's funds from SEG 1. (Trustee's SoAF ¶ 31) (citing Administrator_ BloomWAV_42A0, Ex. 42 to Trustee's SoAF [112-44]; Transcript of phone call between Gregory Hardiman and Steven Stitle of 3/28/07 ("Hardiman Call Tr."), Ex. 43 to Trustee's SoAF [112-45].) Their conversation was recorded by Sentinel. Hardiman told Stitle that "[UBS had] made a decision internally to exit the positions" but that UBS would give Sentinel an opportunity to explain how Sentinel was earning their yields in the SEG 1 fund and consider re-entering the fund in the future. (Hardiman Call Tr. 2:9–12.) Stitle asked Hardiman if UBS had any specific

concerns, and Hardiman replied that "I think it's more of a . . . lack of understanding of [the] detailed positions." (*Id.* at 3:5–6.) Hardiman continued:

> My understanding is [Sentinel's] rates of return are fairly high relative to what anybody out there is getting at the moment[,] . . . historically. I'd like to understand how you're [ ] achieving that. . . . The perception would be you're taking more risk as a result, and I'd like to understand what those risks are and where you're picking up your yields . . . in the underlying portfolio.

(*Id.* at 5:2–13.) Stitle offered to "put together a team probably with the CEO and myself and . . . just shoot out there and do a little dog and pony show," but Hardiman insisted that any future presentation "has to be specific to the portfolio" and that he "would like to see the portfolio manager in there . . . explaining what he's doing and how." (*Id.* at 4:10–21.) Hardiman also provided a list of concerns he had regarding SEG 1:

> What are the risks, what — where are you at within 125 [the 125 Portfolio, a.k.a. SEG 1], where are you getting the pickup and . . . how. So are you going out double A, you know, going all . . . the way out on the credit spectrum in terms of 125 and all the way out in terms of duration. . . . You know, what is it. And — and I believe we'd like to understand that.

(*Id.* at 5:17–6:2.) Stitle assured Hardiman that "those are questions we can answer fairly easily" and that he would contact Hardiman again in a month to set up the presentation. (*Id.* at 6:16–19.)

Immediately after the phone call, Stitle e-mailed Eric Bloom and Charles Mosley stating:

> Just got off the phone with Greg Hardiman @ UBS. They are pulling the $$$ because they are not comfortable with how we obtain the yields we post without incurring some "unknown" level of risk. Greg agreed to give us a chance to explain how we achieve this but is expecting a Q & A session in Stamford with you, me & Charles. I suspect the bulk of the questions will be directed to Charles.
> . . .
>
> Conversation was slightly more positive than I expected. Bottom line is that they can't stay invested in a vehicle that they don't fully understand & are [sic] comfortable with.

(E-mail from Steven Stitle to Eric Bloom and Charles Mosley of 3/28/07 ("Stitle E-mail"), Ex. 44 to Trustee's SoAF [112-46].) The meeting never occurred. On March 30, 2007—two days after the call—UBS withdrew its entire stated account balance from Sentinel: $108,387,950.97. This

13

amount included the $14,401,341.15 worth of cumulative interest credited to UBS's account that the Trustee now seeks to avoid.  (Trustee's SoAF ¶ 33.)

Later, in August 2007, Hardiman discussed the news of Sentinel's then-recent collapse in an e-mail to a coworker: "Hope people realize the value added by exiting the Sentinel fund . . . Don't think people really appreciate/understand what could have been and the headache, potential issues/losses avoided here.  People should be aware that we performed due diligence on the fund and made an informed decision to exit."  (E-mail from Gregory Hardiman to Kevin Maloney of 8/16/07, Ex. 46 to Trustee's SoAF [112-48].)  In another e-mail summarizing UBS's financial position in light of the overall market downturn over the summer of 2007, Hardiman repeated his claim that "[a]fter due diligence performed, we exited Sentinel in Q107, avoiding a potentially large loss."  (E-Mail from Gregory Hardiman to James Buckland, et. al., of 8/23/07, Ex. 47 to Trustee's SoAF [112-49].)  Another employee then talked up Hardiman's work to others, stating: "We inherited a $100mm placement with Sentinel with the ABN merger that Greg decided to exit in Q1 due to his concerns about the funds."  (E-mail from John Laub to Daniel Coleman, et. al., of 8/23/07, Ex. 48 to Trustee's SoAF [112-50].)

The parties dispute the relevance and meaning of this evidence.  The Trustee argues that these internal communications reveal Sentinel's fraudulent intent when making the transfer, as the phone calls and emails establish that UBS was "suspicious" of the generous returns Sentinel was earning, and created an incentive for Sentinel's managers to cover up their segregation violations and fraudulent interest calculations by paying UBS all of what Sentinel (wrongfully) said UBS was owed. (Trustee's Resp. Br. 14–15.)   UBS argues that the communications are irrelevant as they only speak to UBS's intent when *requesting* the transfer, and that, at best, they merely "confirm that the reason UBS closed its account with Sentinel was because it was unfamiliar with Sentinel and did not fully understand Sentinel's investment process."  (UBS's Resp. to Trustee's SoAF ¶¶ 31–34.)

In addition to providing Sentinel and UBS's internal communications regarding the transfer, the Trustee also supplies evidence regarding the origin of the money Sentinel used to pay UBS. The Trustee, through an expert witness, Anne Rasho Vanderkamp, claims that the money used to pay off UBS's account did not come from an account segregated for SEG 1. (Decl. of Anne Rasho Vanderkamp ¶ 5 ("Vanderkamp Decl."), Ex. 45 to Trustee's SoAF [112-47].) Rather, the money originated in a SEG 3 cash account—meaning that Sentinel paid UBS with other customers' money. (*Id.*)

As mentioned above, Sentinel maintained six segregated cash holding accounts at JP Morgan in addition to its numerous accounts at the Bank of New York. (Trustee's SoAF ¶ 10; McCloskey Rep. ¶¶ 53, 58–59.) The parties agree on most characteristics of these accounts. The JP Morgan cash accounts "were non-transactional, meaning that their sole purpose was to hold customer cash in segregation." (Trustee's SoAF ¶ 10.) Three of them were non-interest bearing; the other three did bear interest and were linked to a corresponding non-interest account. (McCloskey Rep. ¶ 58.) One of the non-interest bearing, segregated accounts was called the "Sentinel Management Group, Inc. III – 1.2" account, number 304-653403 (the "JP Morgan SMG III account"). (*Id.*) On March 30, 2007, Sentinel transferred $120 million from the JP Morgan SMG III account to the SEN clearing account at the Bank of New York. (Trustee's SoAF ¶ 33.) From there, Sentinel transferred $127.6 million from the SEN account to Sentinel's SEG 1 segregated cash account at the same bank. (*Id.*) Sentinel then wired the full $108,387,950.97 redemption payment from that cash account to UBS. (*Id.*) The parties' factual agreement ends there.

The Trustee alleges that the cash in the JP Morgan SMG III account (and its paired interest-bearing account) was supposed to remain segregated for the benefit of Sentinel's SEG 3 customers. (Trial Tr. in *Grede v. FCStone, LLC*, No. 09-CV-136 ("*FCStone* Trial Tr."), 205, 708, Ex. 4 to Trustee's SoAF [112-4]; Deposition of Jeff Logan in *SEC v. Sentinel Management Group, Inc.*, No. 07-CV-4684 ("*SEC* Logan Dep."), 202:10–203:10, Ex. 10 to Trustee's SoAF

[112-10].)  UBS was not a SEG 3 customer.  The Trustee claims that the other two sets of JP Morgan accounts were segregated for SEGs 1 and 2, respectively.  (*Id.*)  The Trustee also claims that the March 30, 2007, cash transfers that facilitated Sentinel's payment to UBS left SEG 3 undersegregated by $386,800,000—with just 45% of the assets allocated to SEG 3 on paper actually being held in segregation for the benefit of SEG 3's investors.  (Vanderkamp Decl. ¶ 9.)  After the transfer to UBS, SEG 1 itself was also left undersegregated by 29%.  (*Id.* at ¶ 8.)

UBS responds that the Trustee mischaracterizes the nature of the JP Morgan accounts.  UBS asserts that, despite the name "SMG III," the JP Morgan SMG III account was open to cash from *either* of SEGs 1 or 3.  (UBS's Resp. to Trustee's SoAF ¶ 8.)  "While Sentinel's internal account naming labeled that account as SEG 3 [or "III"], the account was not used that way."  (*Id.* at ¶ 33.)  Rather, SMG III was the third account opened with JP Morgan, and duplicates the role held by another account—number 323-961355, "Sentinel Management Group, Inc. – 1.20" ("SMG 1.20")—which was already serving both SEG 1 and SEG 3.  (Id. at ¶¶ 8, 33; McCloskey Rep. ¶ 58.)  UBS asserts that the Trustee's position represents a continued misunderstanding of the nature of Sentinel's *pro rata* investment scheme: "the Trustee fails to acknowledge that the key function of the daily allocation of securities [is] that all deposits on account are invested in a pool of securities, the composition of which is flexible from day-to-day in order to free up cash."  (UBS's Resp. to Trustee's SoAF ¶ 33) (citing McCloskey Rep. ¶¶ 100–112, 216–217.)

UBS supports its view of the true nature of the JP Morgan SMG III account with further evidence from its expert report by Frances McCloskey in the *FCStone* test case.  According to that report, of the three sets of paired accounts at JP Morgan, only one set was reserved for a single SEG—and that set was titled "Sentinel Management Group, Inc. – 30.7" and segregated only for SEG 2 funds.  (McCloskey Rep. ¶ 58) (stating that the accounts were so named because they were "compliant with CFTC Rule 30.7 (i.e. for SEG 2 cash).")  UBS also notes

16

findings from a 2006 National Futures Association ("NFA") audit of Sentinel's accounts, in which the auditors acknowledged the pooling of SEG 1 and SEG 3 cash in the SMG 1.20 account but did not cite it as a violation requiring corrective action.[6] (7/24/06 Summary of Audit Findings ("July 2006 NFA Audit"), Ex. 11 to UBS's Resp. to Trustee's SoAF [122-1].) Examining much of the same evidence, Judge Zagel in the *FCStone* test case sided against the Trustee, and found that while one of the JP Morgan accounts was segregated for SEG 2, the other two "non-interest bearing accounts and their interest bearing counterparts were available to be used *for both SEG 1 and SEG 3* customer funds." *Grede v. FCStone, LLC*, 485 B.R. 854, 862 (N.D. Ill. 2013), *rev'd on other grounds, FCStone I*, 746 F.3d 244 (7th Cir. 2014).

Finally, UBS notes that several other Sentinel clients withdrew funds from Sentinel between February and April 2007. These other transfers were substantially smaller that UBS's, ranging in amount from $1.2 to $11.2 million, but UBS contends they demonstrate that the March 30 UBS transfer was simply business as usual. (UBS's SoF ¶ 22; UBS Securities, LLC's Reply in Support of its Motion for Summary Judgment [120] ("UBS's Reply Br."), 13 n.5.) The early 2007 transactions occurred several months before Sentinel's repo counterparties returned hundreds of millions of dollars' worth of high-risk, illiquid securities and demanded hard cash in return—the event that ultimately brought down the firm. *See FCStone I*, 746 F.3d at 249–49; *Bloom*, 846 F.3d at 249. It is also undisputed that Sentinel's officers "remained substantially invested in Sentinel" until at least the summer of 2007.[7] (UBS's SoF ¶ 23.) On July 18, 2007, Chairman Philip Bloom suddenly withdrew $11.3 million, "the majority of the funds in the [H]ouse account." *Bloom*, 846 F.3d at 253. CEO Eric Bloom "likewise made unusual

---

[6] The SMG III account at issue in this case did not exist at the time of the 2006 audit, (*see FCStone* Trial Tr. 239:19–24, 708:1–13), but UBS asserts that it served an identical purpose as the SMG 1.20 account: holding both SEG 1 and SEG 3 cash. (McCloskey Rep. ¶ 58.)

[7] The Trustee disputes that the funds actually belonged to the insiders or constituted an "investment" as opposed to the "fraudulent proceeds of Sentinel's unlawful leverage scheme," but acknowledges that the funds existed in the House account and were withdrawn on the stated dates. (Trustee's Resp. to UBS's SoF [114], ¶¶ 23–24.)

withdrawals" in June and July 2007, giving himself an early bonus and retroactive raise in amounts totaling $250,000. *Id.* The timing of these insider withdrawals, UBS contends, also shows that "no financial crisis or market pressure" existed until months after UBS's withdrawal, when Sentinel's repo counterparties pushed back the risky securities. (UBS's Reply Br. 23.) As a result, UBS claims, "there is no evidence that Sentinel did anything unlawful or extraordinary to satisfy UBS's redemption request, or that it had a detrimental impact on Sentinel's other customers." (*Id.*)

## PROCEDURAL BACKGROUND

### 1.     Early Bankruptcy Court Proceedings

Sentinel filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on August 17, 2007. After a flurry of early litigation and distributions authorized by the bankruptcy court, the relevant stakeholders approved a plan to liquidate Sentinel's remaining assets on December 11, 2008. (Order Approving Chapter 11 Plan [1257] in *In re Sentinel Management Group, Inc.*, No. 07-BR-14987, 1.) The Liquidation Plan was approved over the objections of numerous SEG 1 investors (the "SEG 1 Objectors"), many of whom were later involved in the *FCStone* test litigation to sort out the issues arising under the Plan. Because UBS closed its account ahead of Sentinel's bankruptcy, it never filed claims against the estate and so was not involved with the Plan's approval. (UBS's SoF ¶ 31.) As a result, most of the provisions in the Liquidation Plan are not relevant to this dispute. UBS highlights one portion, however, as evidence that the Trustee should be judicially and collaterally estopped from challenging the legitimacy of the cumulative interest as "false profits." (UBS's Opening Br. 21–24.)

At a hearing prior to the Plan's approval, the Trustee argued in favor of "computing customer claims based on account balances as of the last date customers saw them [August 13, 2007], minus any withdrawals that they had up through the petition date." (Transcript of Proceedings on 8/13/08 ("8/13/08 Hearing Tr."), 35:13–16, Ex. 20 to UBS's SoF [98-20].) The Trustee's proposal prevailed: the approved Liquidation Plan stated that "[f]or the purposes of

calculating Adjusted Percentage Recoveries and Percentage Recoveries, and for purposes of making Initial Distributions and establishing reserves, each Class 3 Customer Claim shall equal the amount listed as 'Net Equity' on such Holder's Customer Account Statements dated August 13, 2007." (Fourth Amended Plan of Liquidation [1251] in *In re Sentinel Management Group, Inc.*, No. 07-BR-14987 ("Liquidation Plan"), § 4.4.) Under this calculation, claims included the interest that appeared on customer accounts. (UBS's Opening Br. 21, 23.) UBS argues that the Trustee is therefore estopped from taking the "wholly inconsistent position" that the cumulative interest constituted "false profits." (*Id.* at 22.)

The Trustee responds that UBS selectively misreads his testimony and misstates the actual terms of the Liquidation Plan. (Trustee's Resp. Br. 30.) Neither his hearing testimony nor the Plan, the Trustee states, concede the legitimacy of the cumulative interest. (*Id.*) Instead, the Trustee insists that his testimony addressed the limited question of whether initial distributions and reserves under the Plan would be calculated using a "net investment" methodology (based on the amounts invested and appearing on customer accounts) or a "net equity" methodology (based on the hypothetical liquidation value of the securities). [8] (Trustee's Resp. to UBS's SoF [114], ¶ 26; 8/13/08 Hearing Tr. at 32:17–36:2.) The Trustee claims that he argued for the net investment method because using the net equity alternative "would have unfairly punished customers to whose accounts illiquid and valueless securities unlawfully had been allotted." (Trustee's Resp. Br. 30.) Later at the same hearing cited by UBS, counsel for the Trustee explained:

> [We] are talking about treating everybody equally, we are talking about the amount that they put into Sentinel. In this case the customer put $18.5 million into Sentinel. We are not talking about respecting the account statements that

---

[8]     Confusingly, the term "net equity" as a method of calculating interest and the term "Net Equity" as used on customer statements and in the Plan mean opposite things. Basing initial claim calculations off a customer's "Net Equity"—in clearer terms, the "account balance"—was the result of the Trustee's successful effort to calculate claims using the net investment methodology. A net equity <u>method</u> would not have utilized a customer's account balance. (*See generally* Trustee's Resp. Br. 30–31.)

are completely fraudulent, that everyone in this courtroom knows were completely fraudulent.

On this day, this account statement said there was a bunch of junk in junk trading account. On a different day, it said something different. These are made up. So we are not treating everybody equally based on Eric Bloom's lies to the customers. We are treating everybody based on what they put into the company.

(8/13/08 Hearing Tr. 176:19–177:8.)

The bankruptcy court ultimately approved the Trustee's preferred net investment-based claim calculation over the objection of the SEG 1 investors. (Trustee's SoAF ¶ 35.) The Trustee maintains, however, that his decision to support the net investment methodology cannot be interpreted as an admission to the accuracy of Sentinel's customer statements—and therefore the cumulative interest. Rather, he only chose to utilize customer account balances "because it was the most expedient and cost-effective method to make initial distributions" given Sentinel's extensive comingling of customer funds. (Trustee's Resp. Br. 31); *see also In re Sentinel Management Group, Inc.*, 398 B.R. 281, 310–14 (Bankr. N.D. Ill. 2008). The Trustee claims that this understanding was built into the Liquidation Plan, and cites the mandatory Disclosure Statement referenced in the Plan, which reads in relevant part:

[A]s tested by the Plan Proponents over the three and a half year period of time preceding the Petition Date, the notional value that Sentinel reported to Sentinel's Customers on its monthly account statements closely approximated Customers' "net investment" Claim measured over the same period. . . . Given the proximity of the amount reported to Customers by Sentinel on their customer statements to their actual "net investment" (when provision is made for time value of money), and due to the unreliable and incomplete nature of Sentinel's books and records (which would obfuscate any attempt to arrive at a perfectly accurate measurement of "net investment"), the Plan Proponents believe that the amount reported by Sentinel on Customers' account statements is in fact the most efficient, equitable method to calculate Customer Claims.

(Disclosure Statement [592] in *In re Sentinel Management Group, Inc.*, No. 07-BR-14987, at 31.) UBS responds that whatever the Trustee's reasons may have been, "the Plan's *effect* was to legitimize the cumulative interest." (UBS's Reply Br. 25) (emphasis in original).

## 2. The Present Complaint

On June 24, 2009, the Trustee filed the present adversary proceeding against UBS in bankruptcy court. (Complaint 22.) On November 4, 2009, Judge Zagel of this court entered an order withdrawing the reference of this dispute from the bankruptcy court. (11/4/09 Order, Ex. 24 to UBS's SoF [98-24].) UBS originally moved for summary judgment [32] in June 2012. Judge Zagel held that motion under advisement for several years as two related cases traveled back and forth on appeal. The case was reassigned to this court on April 25, 2017, after Judge Zagel took senior status. This court then struck UBS's summary judgment motion without prejudice and ordered the parties to re-brief the motion. (5/19/17 Status Hearing [92].)

The Trustee's complaint against UBS alleged three counts in connection with Sentinel's transfer of $14,401,342.15 in cumulative interest on March 30, 2007. Count I sought to avoid the payment as an actual fraudulent transfer under 11 U.S.C. § 548(a)(1)(A), Count II sought to avoid the same transfer as constructively fraudulent under Section 548(a)(1)(B), and Count III sought the disallowance of any claims that UBS had against Sentinel's estate. (Complaint 18–22.) Based on the Seventh Circuit's opinion in *FCStone I*[9] and the lack of any claims by UBS against the bankrupt estate, the Trustee has admitted that the court should dismiss Counts II and III. (*See* Trustee's Omnibus Response to Defendants' 2012 Motions for Summary Judgment [36], 26; Trustee's Sur-Reply to 2012 Motions for Summary Judgment [63-1], 5 n.3.) Only Count I, alleging an actual fraudulent transfer, remains at issue in UBS's motion for summary judgment.

Count I asserts that Sentinel's managers acted with the "actual intent to hinder, delay, or defraud" Sentinel's other investors. That claim rests on three core theories: (1) that the entire cumulative interest total consists of "false profits"; (2) that Sentinel made the transfer in order to cover up and perpetuate its fraud after UBS "became suspicious of Sentinel's business"; and (3)

---

[9] In *FCStone I*, the Court of Appeals held that the Trustee's constructive fraudulent transfer claims against other SEG 1 investors were barred by the "safe harbor" provisions in 11 U.S.C. § 546(e). 746 F.3d at 252–53.

that Sentinel made the transfer using funds belonging to a different class of investors. (Complaint 8–13; Trustee's Resp. Br. 18–23.)

UBS's motion for summary judgment asserts that the Trustee alleges only a "general scheme to defraud" and that the Trustee has not established a genuine dispute of material fact as to Sentinel's intent regarding the specific transfer at issue in this case. (UBS's Opening Br. 2–3.) UBS further argues that the Trustee is estopped from arguing that the interest paid to UBS was anything but genuine based on the results of—and the Trustee's statements during— related litigation. Overall, UBS describes Count I as "merely a poorly disguised preference claim" that the Trustee pleaded as a fraudulent transfer in order to avoid the 90-day limitations period applicable to bankruptcy preference actions. (*Id.* at 3.)

## DISCUSSION

### 1. Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. In ruling on a motion for summary judgment, the court views the evidence in the light most favorable to the non-moving party—here, the Trustee—and draws all reasonable inferences in the non-moving party's favor. *Gillis v. Litscher*, 468 F.3d 488, 492 (7th Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). A genuine dispute of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012).

The Trustee sued to avoid Sentinel's payment of $14.4 million in cumulative interest to UBS as an actual fraudulent transfer under 11 U.S.C. § 548(a)(1)(A). In order to prevail and claw back the $14.4 million to the liquidation trust, the Trustee must prove that Sentinel acted "with actual intent to hinder, delay, or defraud" its other creditors. *Id.* On a fraudulent transfer claim, "[d]irect proof of actual intent to defraud is not required—indeed, it would be hard to come by—and a trustee can prove actual intent by circumstantial evidence." *Frierdich v. Mottaz*,

294 F.3d 864, 869–70 (7th Cir. 2002). Courts will often look to the "badges of fraud" as circumstantial evidence of intent.[10] *Id.* The intent to defraud "will be found if the circumstances indicate that the main or only purpose of the transfer was to prevent a lawful creditor from collecting a debt." *King v. Ionization Intern., Inc.*, 825 F.2d 1180, 1186 (7th Cir. 1987).

Sentinel's intent when making the transfer is a question of fact. *See id.* This court recognizes that "summary judgment ought to be used sparingly and with great caution in cases such as this one where subjective intent is a factor in the determination." *Alexander v. Erie Ins. Exchange*, 982 F.2d 1153, 1160 (7th Cir.1993); *see also Allstate Ins. Co. v. St. Anthony's Spine & Joint Inst.*, No. 06 C 7010, 2010 WL 3274283, *3 (N.D. Ill. Aug. 17, 2010) (denying the defendant's motion for summary judgment in an actual fraudulent transfer case). A district court is nevertheless "not obliged to entertain a 'metaphysical doubt.'" *Alexander*, 982 F.2d at 1160. Even in cases involving subjective intent, "summary judgment is not inappropriate where the undisputed facts make the outcome clear." *Id.* (affirming summary judgment where the evidence was not sufficient to permit a jury to conclude that the defendant possessed the subjective intent to defraud).

## 2.      UBS's Legal Arguments

As a preliminary matter, UBS asserts that numerous legal doctrines apply to bar—either in part or in whole—the Trustee's claim to avoid the cumulative interest transfer, regardless of

---

[10]        The "badges of fraud" include:

> [W]hether the debtor retained possession or control of the property after the transfer, whether the transferee shared a familial or other close relationship with the debtor, whether the debtor received consideration for the transfer, whether the transfer was disclosed or concealed, whether the debtor made the transfer before or after being threatened with suit by creditors, whether the transfer involved substantially all of the debtor's assets, whether the debtor absconded, and whether the debtor was or became solvent at the time of the transfer.

*Frierdich*, 294 F.3d at 870; *see also Grede v. Bank of New York Mellon*, 441 B.R. 864, 881 (N.D. Ill. 2010).

the evidence.  None of UBS's arguments are successful, although some do apply to narrow the scope of the court's inquiry.  The court will address all of them in brief.

      a.        **The Trustee's new theories do not "effectively amend" the Complaint**

UBS argues that summary judgment should be granted in its favor on the two new theories of recovery raised by the Trustee for the first time in his brief in opposition to UBS's motion for summary judgment.  (UBS's Reply Br. 15.)  UBS claims these two "new theories" are that "(1) Sentinel was allegedly 'undersegregated' at the time of the March 30 Transfer; and (2) funds for the March 30 Transfer allegedly came from a 'SEG 3 cash account.'"  (*Id.*)

UBS is correct that a plaintiff is not free to assert wholly new claims in briefs opposing a motion for summary judgment.  *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996).  That is not what the Trustee has done here, however.  The Trustee's claim—that the $14.4 million transfer was made with fraudulent intent and must be avoided—remains the same.  The Trustee pleaded the core facts of the transfer at issue, its amount, and specifically alleged that "[s]ecurities were not segregated, and the investment returns were false."  (Complaint ¶¶ 1, 61.)  The Trustee has since discovered evidence of undersegregation and the source of the transferred funds, but this evidence does not contradict his core claim; it supplements his claim.  Furthermore, even assuming that UBS is correct that the Trustee's arguments are "new theories" rather than mere "evidence," plaintiffs are not required to plead specific legal theories in their complaints.  *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 783 (7th Cir. 2015).

Even post-*Twombly*, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff is "not required to plead with precision legal theories or detailed facts."  *Benuzzi v. Bd. of Educ. of City of Chicago*, 647 F.3d 652, 664 (7th Cir. 2011).  Having pleaded facts sufficient to state a plausible claim for relief, the Trustee is within his rights in developing his case further through discovery and defending his claim with those facts at the summary judgment stage.  *See Vincent v. City Colleges of Chicago*, 485 F.3d 919, 923 (7th Cir. 2007) ("Factual detail comes

later—perhaps in response to a motion for a more definite statement, . . . perhaps in response to a motion for summary judgment.")

**b.  The Trustee is not estopped from arguing that the cumulative interest was fraudulent**

UBS also argues that the Trustee is estopped from disputing the validity of the cumulative interest based on "admissions" by its expert, James Feltman, and by the Liquidation Plan.  With respect to each of these issues, UBS has overstated its case.

First, UBS notes that during his deposition in the *FCStone* test case, Feltman acknowledged that Sentinel made "a significant attempt to match the interest accrued and allocated to customer accounts to the actual earnings that the securities would have reflected for those customers." (*FCStone* Feltman Dep. at 219:4–20.)  UBS urges that this "admission" is binding on the Trustee and defeats his claim that all of the interest earned by UBS's investments and credited to UBS's account over the course of several years constitutes 'false profits.'" (UBS's Opening Br. 13.)  As the Trustee notes, however, UBS is taking this passage out of context.  Feltman's testimony as a whole clearly establishes his view that he viewed Sentinel's method of allocating interest to be fraudulent.  (*FCStone* Feltman Dep. 222:4–10.)  Feltman's two expert reports reinforce this idea at length (*see* 2013 Omnibus Feltman Rep. ¶¶ 90–96; 2010 BONY Feltman Rep. ¶¶ 64–68), and, most importantly, several courts have already found that Sentinel's managers did, in fact, regularly falsify the interest they credited to customer account.  *See SEC v. Sentinel*, 2012 WL 1079961, at *16; *Bloom*, 846 F.3d at 250–52; *FCStone II*, 867 F.3d at 789.  Viewing Feltman's admission in the light most favorable to the Trustee, the court agrees with the Trustee's interpretation of that testimony: "that Sentinel tried really hard to appear legitimate." (Trustee's Resp. Br. 25.)

As will be discussed in detail, the court concludes that Feltman's testimony does not prove exactly what the Trustee wants it to prove.  For the purposes of UBS's estoppel argument, however, this cherry-picked portion of Feltman's deposition does not bar the Trustee

from arguing that Sentinel fabricated the precise amount of interest credited to customer accounts.

UBS's second estoppel argument focuses on the Liquidation Plan advanced by the Trustee. The Liquidation Plan fixed customer claims by whatever amount was listed as "Net Equity" on their final account statement before Sentinel filed for bankruptcy—i.e., their account balance. (Liquidation Plan § 4.4.) This amount includes the cumulative interest sum that the Trustee now seeks to avoid. UBS argues that the Trustee may not insist that the interest is legitimate for the purposes of distribution to creditors under the Plan, but not for the pre-petition transfer to UBS. (UBS's Opening Br. 21.) Accordingly, UBS claims that the Trustee should be judicially and collaterally estopped from claiming that the cumulative interest sum constituted "false profits" in this case. (*Id.* at 22.)

Judicial estoppel applies to prevent parties from advancing arguments that contradict arguments they prevailed on in an earlier matter. *Wells v. Coker*, 707 F.3d 756, 760 (7th Cir. 2013). Collateral estoppel applies to bar relitigation of issues that were resolved in a previous lawsuit. *Adams v. City of Indianapolis*, 742 F.3d 720, 736 (7th Cir. 2014). The Trustee would be judicially estopped if his current position regarding the fraudulent nature of the cumulative interest transfer were "clearly inconsistent" with the position he took before the bankruptcy court. *Janusz v. City of Chicago*, 832 F.3d 770, 776 (7th Cir. 2016). The Trustee would be collaterally estopped if the question of whether Sentinel allocated fraudulent interest raises the "same issue" as the method of determining customer claims for purposes of liquidating the firm. *Adams*, 742 F.3d at 736. Neither the inconsistency required for judicial estoppel nor the identity of issues required for collateral estoppel is present in this case.

As with Feltman's testimony, UBS misinterprets the source material. The Liquidation Plan indeed uses customers' account balances, but does so only in three limited contexts: calculating "Percentage Recoveries," making *initial* distributions, and establishing reserves. (Liquidation Plan § 4.4.) Claims must also still be "allowed" under the Plan in order to be paid.

In addition, the Trustee never argued that the interest was legitimate; instead, he took the position that, given the "extensive commingling," the account statements served as "the most expedient and cost-effective method to make initial distributions." (Trustee's Resp. Br. 31.) In the hearing prior to the Plan's approval, counsel for the Trustee nevertheless clarified that the account statements were "completely fraudulent." (8/13/08 Hearing Tr. 176:19–177:8.)

It is also clear from that hearing that the focus of the debate was the choice between the Trustee's "net investment" methodology and the SEG 1 Objectors' preferred "net equity" method of setting claims. (*Id.* at 32:17–36:2.) Either one of these methods necessarily relied on Sentinel's account statements for some purpose: for net equity, the specific securities allocated to each account would be relevant; for net investment, only the overall balance matters. *See In re Sentinel Management Group, Inc.*, 398 B.R. at 310–314. The bankruptcy court found net investment to be the superior method because it was relatively fairer to the investors at a point when asset tracing was considered impossible. *Id.* at 313–14. The approved Plan's Disclosure Statement states outright that the account balances were an imperfect tool, and merely "approximated" a customer's actual net investment as reflected in Sentinel's "unreliable and incomplete" records. (Disclosure Statement 31.) Given this evidence, it is entirely consistent for the Trustee to use a figure that included cumulative interest in connection with liquidating Sentinel while recognizing that Sentinel's procedures allocating that interest were fraudulent.

### c.     Entitlement to be paid is not an absolute defense

UBS also asserts that it was legally impossible for Sentinel to have acted with fraudulent intent when making the March 30 transfer, "because it was merely complying with a redemption request that it did not initiate and was legally and contractually required to honor." (UBS's Opening Br. 2.) The repayment of an antecedent debt, UBS claims, cannot be a fraudulent transfer as a matter of law. (*Id.*)

UBS's position runs contrary to well-established Seventh Circuit case law. The court has long recognized that "a transfer by a debtor to one creditor, even though for consideration,

is still a fraud against other creditors if there is an intent to defraud." *King*, 825 F.2d at 1186; *see also Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995) (discussing the theoretical differences between actual and constructive fraud). So long as the Trustee can raise a reasonable inference of actual fraudulent intent, the transfer may be avoided. Challenging this principle, UBS cites *B.E.L.T., Inc. v. Wachovia Corp.*, 403 F.3d 474 (7th Cir. 2005), for the proposition that "where a debtor transfers funds to a non-insider third-party creditor in payment of an antecedent debt in an arm's-length transaction, there can be no claim that the transfer was made with 'actual intent to hinder, delay, or defraud any [other] creditor of the debtor.'" (UBS's Reply Br. 3.) The facts in *B.E.L.T.* share many similarities with the situation here, but its holding did not create a bright line rule. The district court had dismissed the creditor's complaint because it failed to plead fraud with particularity. *B.E.L.T.*, 403 F.3d at 478. The Seventh Circuit affirmed, finding that the plaintiff's complaint failed to allege facts that spoke to the debtor's motive in paying the defendant, and, alternatively, failed to adequately demonstrate that the debtor's behavior reflected recognized badges of fraud. *Id.* The Seventh Circuit did not abandon its earlier jurisprudence, and did not conclude that transfers to parties entitled to receive payment on account of an antecedent debt are *per se* legal.

UBS attempts to bolster its interpretation of *B.E.L.T.* with several lower court opinions from other districts—*Matter of Loomer*, 222 B.R. 618 (Bankr. D. Neb. 1998); *In re Carrozzella & Richardson*, 286 B.R. 480 (D. Conn. 2002); and *In re Central Illinois Energy Corp.*, 521 B.R. 868 (Bankr. C.D. Ill. 2016)—but these too do not establish that one who holds a legitimate debt can never be party to a fraudulent transfer. Both the *Central Illinois* and *Carrozzella* opinions discussed a transferee's legal entitlement to the funds it received, but both of those cases regarded claims of *constructive* fraud. *Central Illinois*, 521 B.R. at 873; *Carrozzella*, 286 B.R. at 291–92. Specifically, those opinions addressed whether forgiveness of an antecedent debt counted as "reasonably equivalent value" for a debtor's transfer—a critical question in constructive fraud cases. *Id.* As noted by a bankruptcy judge in this district, "[u]nlike

constructively fraudulent transfers, the adequacy or equivalence of consideration provided for the actually fraudulent transfer is not material to the question of whether the transfer is actually fraudulent." *In re H. King & Assocs.*, 295 B.R. 246, 283 (Bankr. N.D. Ill. 2003) (quoting *In re Cohen*, 166 B.R. 709, 716–17 (B.A.P. 9th Cir. 1996). *Loomer* addressed both constructive and actual fraud, but, like *B.E.L.T.*, the question of actual fraud turned on whether the court could reasonably infer fraudulent intent from the standard badges of fraud in the face of the transferee's right to be paid. *Loomer*, 222 B.R. at 623.

The Trustee agrees that the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.*, the Illinois UCC, and UBS's contract with Sentinel all gave UBS the right to demand the return of its investment. (*See* Trustee's Resp. Br. 26.) However, fraudulent conveyance law "supersede[s] private-law definitions of legal entitlements." *Peterson v. McGladrey & Pullen, LLP*, 676 F.3d 594, 599 (7th Cir. 2012). To hold otherwise would render the law meaningless: when a fraudulent transfer is at issue, the recipient "usually has a right to the money." *Id.* In any event, the Trustee's factual argument in support of his fraudulent transfer claim is that UBS was paid with *other investors' money*. The CEA and Illinois UCC do not shield transfers of other investors' money simply because the transferee had the general right to be repaid.

What *B.E.L.T.* and cases like it really state is that when a plaintiff lacks direct evidence of fraudulent intent and instead takes the *indirect* route of inferring fraud from the circumstances of the transfer, or from the "badges," the transferee's legal right to receive the transfer is strong evidence that the transfer was not made with the intent to defraud. *B.E.L.T.*, 403 F.3d at 477–78 ("Plaintiffs have not pointed to any decision from Illinois (or any other state) that treats a comparable payment of a third-party creditor, which dealt with the debtor at arms' length, as a fraudulent conveyance on the theory that paying an antecedent debt evinces 'actual intent'"); *see also Boston Trading Group, Inc., v. Burnazos*, 835 F.2d 1504, 1510–11 (1st Cir. 1987) (describing an allegedly fraudulent transfer's fit within one of three standard "paradigms" of actual fraud as "significant," but not dispositive when determining fraudulent intent); *In re Sharp*

*Intern. Corp.*, 403 F.3d 43, 54–56 (2d Cir. 2005) (adopting the First Circuit's reasoning from *Boston Trading*). Contrary to UBS's position, however, there is no presumption of legality in the face of actual evidence of a transferor's intent to hinder, delay or, defraud. The transferee's entitlement to the transfer is merely one additional piece of evidence for the factfinder to consider, not a complete defense.

### d. The Seventh Circuit's *FCStone* opinions do not bar the Trustee's claim

In *Grede v. FCStone, LLC*, 867 F.3d 767 (7th Cir. 2017) ("*FCStone II*"), the Seventh Circuit held that former SEG 1 customer FCStone, LLC and a similarly-situated group of SEG 1 Objectors were entitled to sole ownership of a pool of reserve funds set aside under the Liquidation Plan. *Id.* at 783–84. The Trustee had sought to divide the reserve funds among all of Sentinel's SEG 1 *and* SEG 3 customers. The court held that the funds the SEG 1 Objectors had invested in Sentinel were protected by statutory trusts and that SEG 1 Objectors were entitled to the benefit of "reasonable tracing conventions (or 'fictions')" in seeking the return of their investments. *Id.* Furthermore, the court found that the "essentially unrebutted" testimony of FCStone's expert, Frances McCloskey, established that the SEG 1 Objectors could *actually* trace ownership of their funds and the securities Sentinel purchased for their accounts. *Id.* at 784.

In his reply brief, UBS contends this decision undermines the Trustee's description of Sentinel's business practices as a whole. Broadly speaking, the Trustee has asserted that Sentinel's fraudulent practices consisted of: (1) issuing false customer statements that misrepresented the assets held in segregation; (2) engaging in "very involved machinations of 'allocating' [ ] its securities" to create the impression that customer assets were segregated; (3) pledging customer assets as collateral for the overnight loan and using the proceeds for the benefit of its own leveraging trading strategy; and (4) calculating interest based on the total portfolio, rather than a SEG-by-SEG basis, and then manipulating the returns among its customers. (Complaint ¶¶ 42, 43, 55–60; Trustee's Resp. Br. 6–13.) As a function of these

practices, the Trustee contends, Sentinel treated all of its customers' assets as a single "undifferentiated pool belonging to Sentinel itself . . . Securities were not segregated, and the investment returns were false." (Complaint ¶ 61.) UBS claims, however, that the Trustee's characterization of Sentinel's business practices is invalid after *FCStone II*, which, in UBS's view, "flatly reject[s] the Trustee's self-serving characterization of Sentinel's alleged fraudulent scheme." (UBS's Reply Br. 10.)[11] UBS urges the court to apply collateral estoppel based on *FCStone II*.

As UBS reads *FCStone II*, that case "flatly rejected" the Trustee's characterization of Sentinel's fraud on virtually all counts: "among other things, its leveraged trading strategy, the purchase, sale and allocation of customer securities, the undersegregation of customer assets, the use of customer assets as collateral and Sentinel's books and records." (UBS's Resp. to Trustee's SoAF ¶ 12.) As the court understands that case, however, UBS's reliance on it as a panacea stretches the Seventh Circuit's decision far beyond its intended meaning, and does not comport with the voluminous case law addressing Sentinel's bankruptcy.

Indeed, the Seventh Circuit has already avoided one of Sentinel's transfers as made with the intent to defraud. *See BONY II*, 809 F.3d at 964. More importantly, Sentinel's managers are currently serving lengthy prison sentences *for fraud*. *See Bloom*, 846 F.3d at 258. Multiple courts—including the Seventh Circuit in *FCStone II*—have observed that Sentinel's managers committed the charged fraud by calculating interest on a portfolio-wide basis and subsidizing the returns to the more-conservative SEG 1 with interest properly due to the riskier SEG 3. *FCStone II*, 867 F.3d at 789; *Bloom*, 846 F.3d at 246–250; *SEC v. Sentinel*, 2012 WL 1079961, at *16. Those same courts also held that Sentinel's bankruptcy was not

---

[11]    The Seventh Circuit issued *FCStone II* on August 17th, 2017—after UBS filed its Motion for Summary Judgment. UBS raised argument for the first time in its Reply Brief, and the Trustee was afforded leave to file a Sur-Reply to respond to the new argument. (*See* Trustee's Sur-Reply in Opposition to UBS's Motion for Summary Judgment [130] ("Trustee's Sur-Reply Br."), 2–3.)

solely due to a "market driven liquidity crisis," as UBS asserts. (UBS's Resp. to Trustee's SoAF ¶ 11.) *See, e.g., Bloom*, 846 F.3d at 250 (rejecting Eric Bloom's argument that Sentinel's losses were due to "bad business practices . . . and the more general decline in securities markets"). For this reason, collateral estoppel does not apply to bar Trustee's claim to avoid the cumulative interest paid to UBS, nor is the Trustee barred from arguing that Sentinel made the March 30 transfer using other investors' money and with the actual intent to defraud its other investors.

*FCStone II* does change the landscape in some ways, however, as it throws shade on the Trustee's contention that Sentinel's *entire business* was fraudulent from at least 2004 onward. (*See* Trustee's Resp. Br. 23; Trustee's Sur-Reply Br. 5–8.) In addition to his core arguments regarding the March 30 transfer itself, the Trustee asserts that Sentinel's habit of comingling assets renders *all* of its subsequent actions avoidable:

> Because Sentinel was illegally comingling customer funds and using the proceeds of that unlawful activity and new investor deposits to pay redeeming customers, every redemption payment *in and of* itself constituted an intentional misrepresentation of fact with respect to the redeeming investor's redemption rights; each redemption is based on the investor's account statements falsely reflecting the segregation of securities for their benefit, and falsely reflecting profits attributable to the customer's account.

(Trustee's Resp. Br. 23) (emphasis in original). The Trustee's arguments, and his Complaint, focus in large part on Sentinel's overall business practices, not the March 30 Transfer. (*See* Complaint ¶¶ 11–80.) Here, however—and like UBS—the Trustee goes too far.

The Seventh Circuit explicitly rejected the Trustee's claim of rampant non-segregation in *FCStone II.* In fact, the Seventh Circuit questioned the entire basis for the Trustee's argument:

> [T]he trustee continues to argue that FCStone relied on "phony" records and a "fictional, arbitrary allocation process with no basis in reality." The trustee is arguing in essence that because Sentinel unlawfully used customer assets as collateral for its own borrowing, all of its records amount to nothing more than smoke and mirrors. The trustee also contends that Sentinel's customer ledgers are unreliable because they do not show securities owned by the house (which seems unsurprising to us since these are *customer* ledgers), and because customer statements did not disclose the risk to customers from Sentinel's use of their assets as collateral to support its own leveraged trading strategy. But the trustee cites no legal authority to show that these facts render Sentinel's internal records meaningless, and he cites no record evidence to show that McCloskey's

> tracing analysis was flawed. In our view, McCloskey's forensic analysis therefore remains unrebutted.
>
> . . .
>
> All parties to this case agree that Sentinel broke the law by using client assets as collateral for its Bank of New York loan. (Two of Sentinel's executives are serving prison sentences, after all.) But that fact does not mean that FCStone cannot prove what it owned. Sentinel *risked* customer assets by pledging them as collateral, but that misconduct did not affect McCloskey's ability to *trace* those assets. The fact that SEG 3 customers happened to be the last victims of Sentinel's machinations does not confer upon the district court broad equitable discretion to remedy their injury at the SEG 1 customers' expense.

*FCStone II*, 867 F.3d at 787–88 (emphasis in original). In ruling against the Trustee, the Seventh Circuit found that the Trustee was wrong to view Sentinel's records as "a complete fraud." That view rested on the Trustee's expert's review of irrelevant evidence: namely, records from the Bank of New York and Sentinel's "securities inventory," rather than Sentinel's "detailed customer ledgers." *Id.* at 786. Defendant FCStone also presented unrebutted evidence that maintaining a single clearing account was an industry-standard practice, *id.* at 787, that pooling customer assets within each SEG and granting pro rata shares of those pools were permissible activities, *id.* at 789, and, critically, that it was possible to identify the location of every security Sentinel purchased and allocated over the entire relevant timeframe. *Id.* at 786.

The Seventh Circuit also rejected the Trustee's maxim that Sentinel had treated customer asserts "as one undifferentiated pool," finding instead that

> Sentinel exchanged customer deposits for a beneficial ownership interest in identifiable securities on a daily basis. The trustee makes much of the fact that securities allocated to customers often were purchased by Sentinel much earlier. But the fact that Sentinel used a buy-and-hold strategy for its securities is irrelevant. The process of converting cash deposits into identifiable securities was unaffected by whether Sentinel already owned the securities or purchased them on the open market in response to new customer deposits.

*Id.* at 789.[12]  The court reiterated, and FCStone conceded, that Sentinel's managers "improperly commingled and illegally pledged customer-owned assets as collateral."  *Id.* at 785.  However, the court did not find "any [other] misappropriation of customer assets," and refused to hold that Sentinel's day-to-day holding activities were somehow fictional or fraudulent aside from the specific situation addressed in the *BONY* litigation.  *Id.* at 784–87 ("The securities Sentinel sold to Citadel in August 2007 were (with limited exceptions) segregated for the benefit of SEG 1 prior to the sale.")

Collateral estoppel applies where an issue was actually litigated in a prior dispute, essential to the final judgment, identical to the issue in the later dispute, and where the party to be bound was fully represented.  *See Matrix IV, Inc. v. Am. Nat. Bank & Trust Co. of Chicago*, 649 F.3d 539, 547 (7th Cir. 2011).  The evidence the Seventh Circuit addressed in *FCStone II* is precisely the same as what is now presented to this court: UBS's McCloskey Report is the one the Seventh Circuit found compelling, and the Trustee's Feltman reports have not been updated to rebut McCloskey in the meantime.  Admittedly, the *FCStone* test case focused on the investors' entitlement to reserve funds set aside under the Liquidation Plan, a matter not at issue here.  *See FCStone II*, 867 F.3d at 771.  The basis for the Seventh Circuit's ruling in *FCStone II*, however, was that the Trustee's characterization of Sentinel's business was at odds with the undisputed evidence.  Otherwise the court would have found asset tracing to be impossible.  Contrary to the Trustee's argument in this case, at least some of the issues addressed in *FCStone II* are identical to the issues advanced in this litigation.  (*See* Trustee's Sur-Reply Br. 5–8) (calling the issue of Sentinel's business practices in this dispute merely

---

[12]    The court recognizes that in *BONY I* the Seventh Circuit quoted Judge Zagel's findings of fact to state that "Sentinel handled 'its and its customers' assets as a single, undifferentiated pool of cash and securities.'"  728 F.3d at 663 (quoting *Grede v. Bank of New York Mellon*, 441 B.R. at 874.)  This finding, however, was mere background information not essential to the court's judgment.  *FCStone II* did not overrule *BONY I*, but given that the Seventh Circuit's more recent statement discussed evidence that was not available during the BONY trial and offered a more detailed investigation of the issue, this court considers itself bound by the Seventh Circuit's final statement on the matter.

"similar" to the practices at issue in *FCStone*). The Trustee also claims that the Seventh Circuit did not reject Judge Zagel's findings of fact (*see id.* at 6), but this misses the point. The Seventh Circuit explicitly stated that it disagreed with Judge Zagel's "legal conclusions stemming from and relating to those findings [of fact]." *FCStone II*, 867 F.3d at 788. This court concludes that the Trustee is collaterally estopped from claiming that Sentinel's allocation process or records were fraudulent, or that Sentinel held its customers' funds "as a single, undifferentiated pool belonging to Sentinel itself." (Complaint ¶ 61.) For the purposes of this motion for summary judgment, any assertions of Sentinel's "fraudulent business practices" are limited to (1) pledging customer assets as collateral for Sentinel's misuse of the overnight loan and (2) misallocating interest revenue across SEGs.[13]

### 3.     The Evidentiary Record

As stated, the Trustee asserts three basic theories of Sentinel's fraudulent intent as it relates to the March 30 transfer. The Trustee's evidence purportedly shows that Sentinel paid UBS from an account holding other investors' money, that UBS withdrew its funds only after becoming suspicious of Sentinel's activities, and that all of the interest credited to customer accounts consisted of "false profits." (Trustee's Resp. Br. 18–23.) The Trustee buttresses his claim with evidence of Sentinel's overall scheme of "illegally comingling customer funds and using the proceeds of that unlawful activity and new investor deposits to pay redeeming customers." (*Id.* at 23.) The Trustee believes that this evidence establishes, or at the very least raises a genuine dispute, that Sentinel wrongfully transferred the property of another to UBS— "the very definition of conduct that has the effect of preventing Sentinel's creditors from their assets." (*Id.* at 21) (internal citation and quotation marks omitted).

---

[13]     The court recognizes that other, unrelated fraud did occur. Sentinel CEO Eric Bloom was also convicted on the theory that he "scheme[d] to solicit and accept new funds during Sentinel's final days without revealing that the company was on the brink of bankruptcy," but that conduct occurred well after the March 30 transfer to UBS. *Bloom*, 846 F.3d at 250–54 ("[Bloom] was charged with fraud only for the funds Sentinel received during its last business week.").

Based on the entire body of evidence, viewed in the light most favorable to the Trustee, this court finds that no reasonable trier of fact could find that Sentinel acted with actual fraudulent intent when transferring the $14.4 million in cumulative interest to UBS.

### a.        Payment from a SEG 3 account

The parties agree that the money used to pay UBS came from the JP Morgan SMG III account, but disagree as to the account's significance.  The Trustee claims that the JP Morgan SMG III account was segregated for the sole benefit of SEG 3 investors.  (Trustee's SoAF ¶ 33.)  If true, this would be strong evidence that Sentinel intended to defraud its other investors when it paid UBS; but the evidence does not support the Trustee's position.

The Trustee and UBS both cite to their opposing expert reports to argue that the JP Morgan SMG III account was segregated for SEG 3 alone, or for SEG 1 and SEG 3 *together*, respectively.   This court will not weigh expert opinions in ruling on a motion for summary judgment; however, UBS supplements its report with a critical piece of evidence.  The NFA's 2006 audit explicitly recognized that Sentinel was permitted to hold SEG 1 and SEG 3 cash together in a single account at JP Morgan.   (July 2006 NFA Audit.)   The auditors' recommendations specifically permitted SEG 1 and SEG 3 funds to remain in the same account, and stated only that SEG 2's funds needed to be held separately.  (Id.)  The JP Morgan SMG III account did not exist at the time of the audit, but it is undisputed that the SMG III account was a duplicate of the audited "SMG 1.20" account and served an identical purpose. The account names are potentially confusing, but as UBS states, "the account was not used that way."  (UBS's Resp. to Trustee's SoAF ¶ 33.)

Testimony by two different witnesses in the *FCStone* test case is also noteworthy.   The Trustee claims that the trial testimony of Sentinel employee Jeff Logan militates in the Trustee's favor, but that testimony is, at best, inconclusive:  Logan stated only that he "believed" that the three JP Morgan cash accounts exactly corresponded to SEG 1, 2, and 3, and later admitted on cross examination that he "wouldn't know anything that the NFA may have said regarding cash

being held at JP Morgan." (*FCStone* Trial Tr. 205:13–24; 238:5–21.) Logan also effectively corroborated UBS's argument by admitting that Sentinel, at the very least, did hold SEG 1 and SEG 3 cash together in the SMG 1.2 account before the SMG III account existed. (*Id.* at 239:1–24.) Later during trial, James Feltman, the Trustee's own expert, admitted on cross examination that SEG 1 and SEG 3 cash was held together in the JP Morgan accounts. (*Id.* at 708.)

Based on this very evidence, another court has already found the Trustee's argument to be without merit. During a bench trial in which he otherwise ruled in favor of the Trustee, Judge Zagel made a finding of fact that "[t]wo of the non-interest bearing accounts [at JP Morgan] and their interest bearing counterparts were available to be used for both SEG 1 and SEG 3 customer funds. The other non-interest bearing account and its interest bearing counterpart was used to hold SEG 2 funds." *Grede v. FCStone, LLC*, 485 B.R. at 862. Judge Zagel's opinion was reversed on appeal, but to the extent the Seventh Circuit disagreed with his treatment of the facts, all of those issues were decided against the Trustee based on the "essentially unrebutted report" of Frances McCloskey. *FCStone II*, 867 F.3d at 784. McCloskey's same report serves as the evidentiary heart of UBS's current motion for summary judgment. That report successfully traced "all of the cash and securities within Sentinel's records (not only those assets allocated to SEG 1) for 2007" and "did not find . . . any evidence of misappropriation of customer assets" apart from the segregation violations connected to the overnight loan. *Id.* at 785.

The Trustee offers new evidence that it claims disputes this finding. Specifically, the Trustee cites an expert report from Anne Vanderkamp to show that the money used to fund the transfer came from the JP Morgan SMG III account. (Vanderkamp Decl. 2.) Notably, the Vanderkamp report does not actually state that the account should have only held cash for SEG 3. (*Id.*) Vanderkamp makes no representations as to the legal requirements governing the JP Morgan cash accounts. Rather, Vanderkamp simply, and without support, refers to the account as the "*SEG 3* cash account." (*Id.*) (emphasis added). As the JP Morgan account

statements she relied on show, that was not the name assigned to the account. (*See* Statement of Account, Ex. 1 to Vanderkamp Decl. [112–47]) (listing the account's name as "Sentinel Management Group, Inc. III – 1.2"). Vanderkamp's declaration does not establish that the funds in the JP Morgan SMG III account were undeniably segregated for the benefit of SEG 3.

Finally, the Trustee also argues that the facts supporting this avoidance action are essentially identical to the facts in his avoidance action against the Bank of New York, which "led the Seventh Circuit to conclude that Sentinel acted with an intent to hinder, delay, or defraud creditors." (Trustee's Resp. Br. 18.) The Trustee argues that the court's decision in *In re Sentinel Management Group, Inc.*, 809 F.3d 958 (7th Cir. 2016) ("*BONY I*"), established, as a matter of law, that actual intent includes unlawfully exposing creditors to a substantial risk of loss of which they are unaware. (*Id.*) The Trustee accurately describes the law, but the facts of *BONY I* are inapposite. The Seventh Circuit avoided the Bank of New York's liens and returned the securities to the bankrupt estate because "Sentinel exposed its FCM clients to a substantial risk of loss of which they were unaware when it *pledged funds* that were supposed to remain segregated for the FCM clients as collateral for Sentinel's overnight loans." *BONY I*, 728 F.3d at 668 (emphasis added). The critical factor in *BONY I* was that the unsegregated funds were pledged as collateral, not merely that they were moved out of segregation. *Id.*; *see also FCStone II*, 867 F.3d at 788 (stating that "Sentinel broke the law by using client assets as collateral" and "Sentinel risked customer assets by pledging them as collateral"). The Trustee claims here that Sentinel's transfer to UBS allegedly left SEG 3 undersegregated by almost $400 million. Assuming first that this statement is accurate—Trustee's expert Vanderkamp appears to rely on the same Bank of New York account statements that the Seventh Circuit found unreliable in *FCStone II* (*see* BONY SEG Cash Account Statements of 3/30/07, Exs. 2 and 3 to Vanderkamp Decl. [112-47])—it is not clear why undersegregation would be dispositive. "Undersegregated" does not mean "insolvent." It only means that the funds were not where they were supposed to be. What was merely a *necessary* condition for finding

fraudulent intent in BONY, the Trustee incorrectly asserts is a *sufficient* condition in this case. The court concludes that no reasonable jury could find based on this evidence that "Sentinel paid UBS with cash that it was legally obligated to hold in segregation for the benefit of its SEG 3 customers." (Trustee's Resp. Br. 19.)

As a final matter, the court also feels compelled to recognize the ill fit between the Trustee's argument and his requested relief. The Trustee claims that *all* the funds used to pay UBS were in fact the property of SEG 3 investors. But if that were true, why then would the Trustee only seek to avoid a portion of the transfer? (*See* UBS's Reply Br. 17) ("If the Trustee really believed that the funds . . . actually belonged to SEG 3 investors, he would have sought to claw back the entire March 30 and not just the Cumulative Interest.") If the Trustee's allegations had any support, he likely would have tried to claw back the full $108 million for the SEG 3 investors—not just the $14.4 million identified as interest.

### b. UBS and Sentinel communications regarding the transfer

The Trustee claims that UBS only withdrew its funds from Sentinel after becoming "suspicious" of Sentinel's business practices. (Trustee's Resp. Br. 19.) In support of this idea, the Trustee cites the recorded phone conversation between a UBS employee and a Sentinel employee, as well as internal e-mails from both companies. UBS responds that the communications are irrelevant because they only reveal UBS's intent in requesting and receiving the transfer. (UBS Resp. to Trustee's SoAF ¶¶ 31–34.) Notably, the Trustee himself makes no further references to these communications after introducing them, nor makes any real attempt to link them to his larger argument concerning Sentinel's intent to defraud.

The communications represent the closest the Trustee comes to establishing direct "mindset" evidence of fraudulent intent. But the phone call and e-mails are insufficient to allow a jury to conclude that Sentinel's managers acted with that intent. A jury could perhaps conclude

that *UBS* was suspicious about Sentinel's activities when it decided to withdraw its funds,[14] but that does not shed light on the relevant question in this case: whether *Sentinel* had the intent to defraud. A transferee's mindset regarding an allegedly fraudulent transfer is irrelevant unless the transferee is a corporate insider—which is not the case here. *See, e.g., In re H. King & Assocs.*, 295 B.R. at 283 ("Where the transferee is an insider of the debtor and is in a position to control the disposition of property of the debtor, the transferee's intent is imputed to the debtor.") Even if UBS had actual knowledge of fraud on the part of Sentinel's managers, evidence that speaks only to UBS's intent as a recipient would not be sufficient for the Trustee to avoid the transfer as fraudulent. *See Boston Trading*, 835 F.2d at 1512; *Sharp*, 403 F.3d at 55.

The sole communication from inside Sentinel simply summarized the contents of the phone call: that UBS was "not comfortable with how we obtain the yields we post" but that UBS would "give us a chance to explain." (Stitle E-Mail.) The e-mail concludes by stating that the "[c]onversation was slightly more positive than I expected. Bottom line is that they can't stay invested in a vehicle that they don't fully understand and are [not] comfortable with." (*Id.*) No reasonable jury could infer intent to defraud from this single, innocuous e-mail. The Trustee also fails to present any statements from Sentinel executives or employees that would suggest that any of Sentinel's other redemption payments to customers were made with the intent to defraud.

At best, UBS's alleged "suspicions" are relevant only to the availability of the "good faith" defense. 11 U.S.C. § 548(c). But the court need not address such a defense unless the Trustee can establish that Sentinel acted fraudulently. In this way, the Trustee's case is very different from his earlier avoidance action against the Bank of New York. In *BONY I*, the Seventh Circuit found that Sentinel had acted with fraudulent intent and then *remanded* the

---

[14] Even this conclusion would be a stretch in light of the evidence the Trustee cites. UBS's internal investment analysis indeed revealed that Sentinel had the highest return among the five rates UBS compared, but Sentinel's returns were only 0.09% higher than the second best yield and 0.27% higher than average yield. (UBS Investment Analyses.) This difference may perhaps be significant, but it is hardly obvious grounds for "suspicion."

case for district court to determine whether the Bank of New York had inquiry notice of Sentinel's fraud. 728 F.3d at 668 n.2. The Seventh Circuit did not overrule the good faith defense and find the transfer avoidable until the case's second appeal, *BONY II*. 809 F.3d at 961–64 (holding that the Bank of New York did not receive the transfer of assets as collateral in good faith). The Trustee has not yet established any fraud with respect to the March 30 transfer to UBS. The court notes that the fraud addressed in *BONY I* was specifically said to be Sentinel's practice of pledging segregated funds as collateral for its *personal* loan. 728 F.3d at 667–68. That decision does not by itself establish a basis for concluding that Sentinel's transfers to customers in accordance with their investment agreements are fraudulent as well. Based on this evidence, no reasonable jury could find that "the main or only purpose of the transfer" was to defraud Sentinel's other customers, *King*, 825 F.3d at 1186, and not simply a response to UBS's demand for a return of its money.

### c.    "False Profits"

As has been discussed, Sentinel did not calculate or allocate interest properly. Instead of distributing interest within each SEG, Sentinel calculated interest revenue based on "the interest earned by all securities, including those belonging to other Seg[s] and the house pool." *FCStone I*, 746 F.3d at 248. Sentinel's managers would then "guesstimate the yield its customers expected to receive on their group's securities portfolio, add a little extra so that the rate of return seemed highly competitive, and report the customer's pro rata share of that amount, minus fees, on the customer's statement." *Id.* This process, other courts have found, was directed at inflating the returns to the 125 Portfolio—SEG 1—at the expense of the Prime Portfolio—SEG 3. Bloom, 846 F.3d at 252. Sentinel's managers also pocketed some of the interest revenue themselves. (Trustee's SoAF ¶ 20.) UBS disputes this, but there is no real argument to be made to the contrary. Generally speaking, Sentinel's managers inappropriately allocated interest in a manner which favored SEG 1—of which UBS was a member.

Nevertheless, the Trustee does not raise a genuine dispute of material fact that Sentinel paid UBS with the intent to hinder, delay, or defraud its other investors. The reason for this is clear. The Trustee does not argue that UBS merely received more than its fair share of interest; the Trustee argues that *all* of the $14.4 million in cumulative interest paid to UBS was "false profits." (Complaint ¶ 81.) "Simply put there was no interest to pay UBS." (Trustee's Resp. Br. 22.) The numerous opinions regarding Sentinel's bankruptcy, however, hold otherwise. The detailed calculations provided by the Seventh Circuit in *Bloom*, for example, show that the overall portfolio earned $263,879.60 on December 7, 2006, and that SEG 1 received $6889.82 more than its actual share. *Bloom*, 846 F.3d at 252. On July 30, 2007, well after the transfer to UBS and just two weeks before Sentinel filed for bankruptcy, "SEG 1 actually earned $63,477.53, but was paid $100,420.34." *Id.* These figures show that SEG 1 received extra interest revenue, but defeat any suggestion that the interest did not exist. Even the Trustee's expert witness does not support the Trustee's claim to avoid the entire $14.4 million. James Feltman states numerous times that Sentinel indeed received interest on its investments, which it credited to the different SEGs on a regular basis. (2013 Omnibus Feltman Rep. 55–58.)

As stated, the Trustee has not provided any evidence regarding the specific securities that UBS should have been earning interest on, nor regarding the exact amount by which UBS was overpaid. Prior cases show that such overpayment was likely, but the undisputed evidence, including evidence submitted by the Trustee, shows that it was minor at best. (*See FCStone* Feltman Dep. at 219:4–20) (saying that Sentinel made "a significant attempt to match the interest accrued and allocated to customer accounts to the actual earnings that the securities would have reflected for those customers.") The Trustee himself admits "that Sentinel tried really hard to appear legitimate." (Trustee's Resp. Br. 25.) No reasonable jury could conclude that the entire $14.4 million payment consisted of "false profits."

Instead, the Trustee repeats his claim that Sentinel was "undersegregated" and that, accordingly, "Sentinel did not have sufficient funds to return all of its customers' initial

investments, let alone interest on those investments." (Trustee's Resp. Br. 21–22.) As stated, however, while the Trustee treats the two terms as synonymous, undersegregated does not mean "insolvent." The Trustee asserts that Sentinel was "insolvent—which necessarily meant its customer account were under-segregated," but provides no support for this claim, citing only to portions of its Complaint which do not suggest insolvency. (Trustee's Sur-Reply Br. 16.) The Trustee's Complaint also inaccurately alleges that Sentinel's entire operation was merely a sham to cover up Sentinel's treatment of the assets under its control as an undifferentiated pool—a theory the Seventh Circuit has rejected. *See FCStone II*, 867 F.3d at 789. Furthermore, the Trustee's focus on undersegregation ignores Seventh Circuit's other findings in *FCStone II* that the Trustee's expert, Feltman, relied on inappropriate documents in crafting his opinions and that UBS's expert, McCloskey, "did not find, after validating the accounting for all of Sentinel's securities inventory for more than 200 business days, any misappropriation of customer assets" beyond the times when Sentinel pledged customer assets as collateral to the Bank of New York. *Id.* at 785.

Based on the evidence, no reasonable jury could find that the *entire* $14.4 million in cumulative interest was money to which UBS was not entitled—and therefore raise the inference that it was transferred with the intent to defraud others. The Trustee has not, however, made any effort to prove the much more likely proposition that a portion of the transfer in fact belonged to others. It seems likely that the Trustee cannot identify what that sum should be. The Trustee suggests that discovery in this case has been "limited," but the more than one hundred unique exhibits attached to the parties' briefs on the motion belie that suggestion. Discovery on this particular matter may have stayed on and off pending the results of related cases, but the Trustee and his lawyers have already had the opportunity to take depositions, examine witnesses at trial, craft expert reports, and examine documents across the dozens of avoidance actions he has filed for the benefit of Sentinel's estate over the past decade. In any case, if the Trustee believed that he was likely to uncover new evidence regarding this eleven-

year-old payment, he should have filed a Rule 56(d) affidavit attesting to that evidence with the court. Instead, the Trustee only presents evidence of the general scheme to manipulate yield rates—which is not sufficient to establish Sentinel's intent in regards to the specific transfer at issue.

### d. Sentinel's generally fraudulent scheme

Having examined and rejected the Trustee's evidence as it purportedly relates to the March 30 transfer to UBS, the court finds that the Trustee's claim ultimately rests only on a general allegation of fraudulent behavior. This, the Trustee suggests, is sufficient to survive summary judgment.

The Trustee cites *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995), to argue that "even if Sentinel has earned some interest on its investments, that fact would not insulate the transfer" from avoidance. (Trustee's Resp. Br. 22.) *Scholes* involved a defendant "lucky enough to make money" from a Ponzi scheme, and the Seventh Circuit found the transfers to the defendant avoidable. *Scholes*, 56 F.3d at 753–58. The court stated:

> It is no answer that some or for that matter all of [defendant's] profit may have come from "legitimate" trades made by the corporations. They were not legitimate. The money used for the trades came from investors gulled by fraudulent representations. [Defendant] was one of those investors, and it may seem "only fair" that he should be entitled to the profits on trades made with his money. That would be true as between him and [the owner] or [the owner's] corporations. It is not true as between him and either the creditors of or the other investors in the corporations. He should not be permitted to benefit from a fraud at their expense merely because he was not himself to blame for the fraud. All he is being asked to do is to return the net profits of his investment—the difference between what he put in at the beginning and what he had at the end.

*Id.* at 757–58. *Scholes*, unlike this case, specifically involved a Ponzi scheme, and the defendant was "an unwitting accomplice" in that scheme: "[defendant] argues (seemingly without realizing the implications of the argument) that by continuing to invest in Douglas's corporations he kept them going longer. Yes, and the longer a Ponzi scheme is kept going the greater the losses to the investors." *Id.*

But Sentinel, as the Seventh Circuit has recognized, was not a Ponzi scheme. *FCStone II*, 867 F.3d at 789. Sentinel actually invested its customers' funds and paid a return. The return was inflated (or deflated, as the case may be), but that does not render Sentinel's entire business fraudulent in the manner of a Ponzi scheme. Sentinel's business was not propped up by continuous influxes of cash, but by loans from the Bank of New York secured using its customers' assets as collateral. Sentinel's fraud, as the Seventh Circuit stated in *FCStone II*, did not extend to its day-to-day business of holding, investing, and selling securities for its customers. *Id.* at 786–89. It was limited to pledging customer assets as collateral for the overnight loan—which is not at issue in this case—and misallocating interest income—the effect of which the Trustee cannot prove here. There is no legal support for the Trustee's sweeping statement that "every redemption payment *in and of* itself constituted an intentional misrepresentation of fact." (Trustee's Resp. Br. 23) (emphasis in original).

The facts of this dispute are much more similar to those addressed by the Seventh Circuit in *B.E.L.T.* In that case, the Seventh Circuit held that a plaintiff suing to avoid transfers from Lacrad International Corp. to an outside lender could not sustain his claim that the transfers were made with fraudulent intent, even though Lacrad's CEO had committed fraud in the course of operating the business. *B.E.L.T.*, 403 F.3d at 476. Lacrad's CEO was not running a Ponzi scheme, but overspending on corporate credit cards and laundering money from the company. *Id.* at 476. As with Sentinel, Lacrad collapsed under the weight of its debts, but Judge Easterbrook, writing for the court, observed that it was not the sort of situation in which a court could properly infer fraudulent intent based on the facts of the case:

> Plaintiffs have not pointed to any decision from Illinois (or any other state) that treats a comparable payment of a third-party creditor (paying corporate insiders and their cronies is altogether different), which dealt with the debtor at arms' length, as a fraudulent conveyance on the theory that paying an antecedent debt evinces "actual intent to hinder, delay, or defraud any [other] creditor of the debtor."

*Id.* at 478.  The underlying fraud involving "false financial statements" and concealed company instability did not automatically render all future transfers subject to avoidance, even though those transfers also "may have made [Lacrad] thirsty for assets [and] reduced the time it could stay afloat."  *Id.* at 478.

Other Circuit Courts of Appeals have ruled similarly to the Seventh Circuit, and stated that courts should be wary of fraudulent transfer claims which fail to fit the "paradigms" of "actual intent to defraud."  *Boston Trading*, 835 F.3d at 1510–11 (stating that courts should avoid confusing a "fraudulent transfer" with situations involving "a form of initial dishonesty . . . that itself happens to be called fraud"); *Sharp*, 403 F.3d at 55 (refusing to avoid a payment "on account of an antecedent debt, [ ] made to an outsider, and [when] there is no admission of subjective bad faith (if indeed that would matter)").  Using language that mirrors the Seventh Circuit's summary of the law in *B.E.L.T.*, the First Circuit described the three paradigmatic cases of actual fraud as (1) sham conveyances in which the debtor maintains control of or continues to benefit from the asset; (2) transfers to a friend, family member, or other entity in a "special relationship" with the debtor; and (3) transfers in exchange for illiquid assets meant to hinder a creditor's efforts to collect.  *Boston Trading*, 835 F.3d at 1508.  No such transfers are at issue in this case.

Most district courts have been cautious in addressing the propriety of non-Ponzi scheme, non-insider transfers.  Earlier, this court rejected UBS's argument that *Carrozzella* and *Central Illinois* supported the idea that transfers on account of antecedent debts are *per se* lawful, *supra* section 2.c.  That argument goes too far, but those cases confirm the Seventh Circuit's unwillingness to characterize such transfers as *per se* unlawful, either.  *See Carrozzella*, 286 B.R. at 489–91; *Central Illinois*, 521 B.R. at 875 n.8 ("In the absence of a Ponzi scheme or an insider transfer, it is hard to see how a debtor's payment to a creditor, even if preferential, could be characterized as an actual fraud against other creditors.") (citing *B.E.L.T.*, 403 F.3d at 478).

The Trustee cites to a case from the Southern District of New York, *In re Bayou Group, LLC*, 439 B.R. 284 (S.D.N.Y. 2010). *Bayou* involved large-scale investment fraud, and the district court upheld the bankruptcy court's decision to avoid the firm's transfers to outside investors. "It was essential to honor every request for redemption in accordance with the investor's expectation based upon the investor's falsely inflated account statement, because failure to do so would promptly have resulted in demand, investigation, the filing of a claim and disclosure of the fraud." *Id.* at 305 (internal citation omitted). "Consequently," the district court found, "every redemption payment *in and of itself* constituted an intentional misrepresentation of fact with respect to the redeeming investor's redemption rights based on the investor's falsely inflated account statement." *Id.* (emphasis in original). The Trustee zeroes in on the "in and of itself" language, but the *Bayou* court's rationale does not control the outcome here. The *Bayou* court found that the firm had been operating a Ponzi scheme, or, at the very least, exhibited "all of the essential elements of such a scheme," including "wholly fictitious profits" and the explicit inducement of new investors in order to pay off old investors. *Id.* at 294, 306–07. In this light, the court explicitly distinguished the facts of *Bayou* from the Second Circuit's own version of the Seventh Circuit's *B.E.L.T.* decision: *In re Sharp International Corp.*, 403 F.3d 43 (2d Cir. 2005). *See Bayou*, 439 B.R. at 294, 300–04 (stating that the fraud in *Sharp* "relates to the manner in which Sharp obtained new funding from Noteholders, not Sharp's subsequent payment of part of the proceeds to State Street. The $12.25 million payment was at most a preference between creditors[.]")

Overall, this court is persuaded that expanding fraudulent transfer liability to this case, which does not, at minimum, exhibit "Ponzi-like" features, would far exceed the intent of the statute and the Seventh Circuit's directives. *See, e.g., In re Petters Co.*, 499 B.R. 342, 350–51 (Bankr. D. Minn. 2013) (discussing *B.E.L.T.* and *Scholes* in the context of a Ponzi scheme and distinguishing *B.E.L.T.*'s single withdrawal from a "foundering debtor's debt structure" as lacking

the "continu[al] churning" of investors and money and "service of the subject transfer in furtherance of th[at] scheme" that was present in *Scholes*).

UBS states that the Trustee's case is nothing more than "a poorly disguised preference claim" that would be otherwise barred because the transaction preceded the 90-day window. (UBS's Opening Br. 3.)  The court finds it difficult to disagree.  It is the Trustee's view that UBS's luck at withdrawing its funds before the financial crisis hit seems too good to be true.  Perhaps it is, but this is not enough to establish that any transfer to an investor during the relevant time is fraudulent.  The Trustee anchors his claim on the hope that a jury will find Sentinel's overall behavior suspicious enough to infer that this specific transfer was fraudulent.  But general schemes are not sufficient: the Trustee is required to prove that the transfer itself was made with fraudulent intent.  *King*, 825 F.2d at 1186.  The Trustee has provided no relevant evidence of intent to defraud as it relates to the March 30 transfer to UBS.  The evidence viewed in the light most favorable to the Trustee does not raise a genuine dispute as to Sentinel's intent when making the transfer—rather, it supports UBS's position that Sentinel paid UBS on demand because Sentinel was required to.  Certainly no adverse inference may be drawn from the mere fact that UBS redeemed its investment.  And although the interest credited to UBS's account was likely overstated by some amount, the evidence does not support the Trustee's belief that *all* $14.4 million constitutes "false profits" derived from a generally fraudulent scheme that never returned profits to investors.  Nor is there any evidence that Sentinel paid UBS from a SEG 3 account or that Sentinel was insolvent in March 2007.  Sentinel's other transfers to redeeming customers around the same time and Sentinel's officers' continued involvement until the summer of 2007 further suggest that Sentinel was operating normally at the time of the transfer to UBS.  As a result, this court concludes that no reasonable jury could find that Sentinel transferred the $14.4 million in cumulative interest with the actual intent to hinder, delay, or defraud its other investors.

## CONCLUSION

For the reasons stated, the Defendant's Motion for Summary Judgment [96] is GRANTED.

ENTER:

Dated:        March 20, 2018        _____
REBECCA R. PALLMEYER
United States District Judge