UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FREDERICK J. GREDE, not individually, but as Liquidation Trustee and Representative of the Estate of Sentinel Management Group, Inc., ) ) ) ) ) ) Plaintiff, ) ) v. ) ) UBS SECURITIES, LLC, ) ) Defendant. ) | No. 09 C 5880<br><br>Judge Rebecca R. Pallmeyer |

## MEMORANDUM OPINION AND ORDER

One year ago, this court ruled on summary judgment that Plaintiff Frederick J. Grede, the Trustee of the Estate of Sentinel Management Group ("Trustee"), is not entitled to recover some $14 million dollars in interest that Sentinel had paid to a creditor, UBS Securities, LLC ("UBS"), before Sentinel filed for bankruptcy in 2007. *See Grede v. UBS Secs., LLC*, 303 F. Supp. 3d 638, 654–55 (2018). The court's opinion fills 34 pages in the Federal Supplement and was issued after full and extensive briefing; the Trustee filed a 39-page response, supported by dozens of exhibits and was granted leave to file a sur-reply of 16 pages as well. After the opinion issued, the Trustee promptly sought reconsideration, relying in part on testimony given in depositions that post-dated the original briefing. UBS has moved to strike that submission. As explained below, UBS's motion is granted, and the Trustee's motion is denied.

## BACKGROUND

The factual background of the Sentinel bankruptcy in general, and of this dispute, is recounted in many published opinions and will not be summarized here in any detail. Briefly: before its bankruptcy, Sentinel was in the business of making safe, short-term investments of excess cash held by other investment firms called futures commission merchants ("FCMs"). Sentinel itself, as well as its investment firm clients, was governed by Commodity Futures Trading

1

Commission ("CFTC") regulations. (*Grede*, 303 F. Supp.3d at 642.) That is, Sentinel was required to maintain its clients' funds in segregated accounts and to limit Sentinel's own use of those funds to investments in certain high-quality government and corporate securities. (*Id.*) Sentinel had purportedly segregated clients' assets into three distinct funds (referred to as SEG 1, SEG 2, and SEG 3), and promised its clients "an undivided, pro rata beneficial interest in the pool of securities" purchased using the money in each fund. (*Id.* at 646.) Sentinel did not always comply with CFTC segregation requirements; in addition, there is evidence that Sentinel falsified interest earned on investments in its customers' accounts, calculating the interest earned by all of the securities in all of the investment portfolios, and then approximating the yield its customers were expected to receive on the purportedly segregated securities portfolios. (*Id.*)

In early 2007, one of the SEG 1 customers, UBS, became concerned about what it suspected were overly favorable earnings projections, and requested return of its investments. On March 30, 2007, Sentinel honored UBS's request for withdrawal of its entire stated account balance: $108,387,950.97, including $14,401,342.15 in cumulative interest ("the March 30 transfer"). The Trustee filed his complaint in this case on June 24, 2009, seeking to avoid the transfer of interest payments in the March 30 transfer under Section 548 of the Bankruptcy Code. The Trustee alleged that the cumulative interest portion of the March 30 transfer constituted "false profits" that should be returned to Sentinel's estate. (*Id.* at 655.) As more fully explained in the court's earlier opinion, the Trustee did not identify "the specific securities that Defendant UBS was supposed to be earning interest on, nor [calculate] . . .the exact difference between the interest UBS was allegedly overpaid and the 'real' interest rate." (*Id.* at 647.) The court concluded that the evidence, viewed in the light most favorable to the Trustee, did not raise a genuine dispute regarding Sentinel's intent when making the March 30 transfer and instead, supported UBS's position that Sentinel paid UBS on demand because Sentinel was required by law to do so. (*Id.* at 671–72.) This court concluded that no reasonable jury could find that Sentinel made the March 30 transfer with the actual intent to hinder, delay, or defraud its other investors. (*Id.* at 672.)

After the court issued its decision, and after the Trustee filed his motion for reconsideration, the Trustee took the depositions of two former or current employees of the National Futures Association ("NFA"), Lauren Brinati ("Brinati") on May 16, 2018 and Dan Driscoll ("Driscoll") on April 26, 2018 in an unrelated case. (UBS Motion to Strike [148] ¶ 18.) Then, in his reply memorandum, the Trustee cited testimony given in these depositions in support of his motion for reconsideration. UBS moves to strike both depositions.

## DISCUSSION

### I. UBS's Motion to Strike

"Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1269 (7th Cir. 1996). Such a motion may not be used "as a vehicle to introduce new evidence that could have been adduced during the pendency of the summary judgment motion." *CBI Indus., Inc.*, 90 F.3d at 1269. In order to support a motion for reconsideration with newly discovered evidence, the moving party must "show not only that this evidence was newly discovered or unknown to it until after the hearing, but also that it could not with reasonable diligence have discovered and produced such evidence [during the pendency of the motion]." *Id.* at 1269.

As UBS notes, the Trustee's Corrected Reply cites depositions taken years after UBS first filed its motion for summary judgment. (UBS Motion to Strike [148] ¶¶ 4–14.) This suit was filed in 2009, and UBS filed its motion and requested a briefing schedule in December 2011. Judge Zagel, before whom the case was then pending, entered a stay pending the outcome of other cases, and then in 2016, the parties filed supplemental summary judgment briefs. When the case was reassigned to this court in April 2017, the parties agreed to a briefing schedule and re-briefed the motion, a process that spanned several months and included a response and sur-reply brief filed by the Trustee. In response to the summary judgment motion, the Trustee did not make a request for further discovery, nor did he seek to depose witnesses from the National Futures

3

Association. More than four months after briefing was completed, this court issued a lengthy opinion in March 2018, and the Trustee promptly filed a brief in support of reconsideration of that opinion. Only then—more than six *years* after the motion was filed—did the Trustee take the depositions of Driscoll (on April 26, 2018), and Brinatti (on May 15, 2018). (UBS Motion to Strike [148] ¶¶ 4, 7, 18.)

As noted, the case was transferred to this court in April 2017. At no time since then did the Trustee ask leave to take additional discovery. Nor did the Trustee invoke FED. R. CIV. P. 56(d) or otherwise argue that he needed additional discovery before responding to UBS's motion for summary judgment. The Trustee now suggests that UBS blocked the Trustee's efforts to take depositions in this case or "hid the ball" by raising a key argument in a reply brief (Trustee's Objection to UBS Securities, LLC's Motion to Strike [150] (hereinafter "Trustee's Objection"), at 2–3), but the court is not moved. The argument that the Trustee refers to—UBS's contention that the Trustee is wrong in asserting that funds transferred to UBS on March 30 belonged to other customers—does appear in a footnote in UBS's reply brief (UBS Reply [120] at 17–18 n. 6.), likely because it is not central to UBS's argument, just as it was not central to the court's ruling. In any event, the Trustee sought and was granted leave to file a sur-reply memorandum. Had the footnote genuinely triggered a need for additional depositions, the court would have expected the Trustee to sound the alarm then.

In short, the Trustee's reliance on the Brinati and Driscoll depositions was an afterthought, not a basis for reconsideration of the court's opinion. If the circumstances described above are not sufficient to demonstrate this, the court notes one more: the Trustee noticed and took those depositions in a different case, without so much as providing UBS with notice or an opportunity to participate in those depositions. UBS contends that the deposition testimony does not rebut the conclusions reached in the court's earlier opinion (UBS Motion to Strike [148] ¶¶ 27-29), but the court need not reach that argument. A Rule 59(e) motion is "appropriately used to fix errors," *Miller v. Safeco Ins. Co. of Am.*, 683 F.3d 805, 815 (7th Cir. 2012) (citing *Moro v. Shell Oil Co.*,

91 F.3d 872, 876 (7th Cir. 1996) ), but does not "provide a vehicle for a party to undo its own procedural failures, and it certainly does not allow a party to introduce new evidence or advance arguments that could and should have been presented to the district court prior to the judgment." *Moro*, 91 F.3d at 876.

The motion to strike the Brinati and Driscoll depositions [145] is granted. The court will not consider the substance of those depositions, nor any portions of the Trustee's reply that refer to or rely on them.

## II. Trustee's Motion for Reconsideration

As noted, the court entered a lengthy decision granting UBS's motion for summary judgment. The court concluded that the Trustee's effort to claw back $14 million dollars in interest it paid UBS in the March 30 transfer was best understood as a "disguised preference claim" barred by timing; the transaction preceded the 90-day period. To establish that the interest payment to UBS constituted a fraudulent transfer under 11 U.S.C. § 548(a)(1)(A), the Trustee would have to show that it was made "with actual intent to hinder, delay, or defraud" other creditors. This court concluded that showing was not made. Along the way, the court rejected several of UBS's defenses; not surprisingly, the Trustee has no quarrel with those portions of the court's opinion.[1] Instead, the Trustee challenges the court's ultimate holding in favor of UBS on three grounds: the Trustee contends: (1) that the court improperly shifted the burden of proof on "disputed factual issues such as solvency" and whether Sentinel's use of its segregated accounts was lawful; (2) that the court improperly weighed "ambiguous or vague witness statements"; and (3) that the court "misapprehended the holdings" in *Grede v. FCStone, LLC*, 867 F.3d 767, 771 (7th Cir. 2017) ("*FCStone II*"). (Trustee's Motion for Reconsideration [138] ¶¶ 2.)

---

[1] UBS had argued that the Trustee was estopped from claiming the interest was fraudulent by Sentinel's liquidation plan and by admissions by an expert witness, that the claim was barred by rulings in a related proceeding, and that UBS's contractual right to recovery of its investment was an "absolute defense" to the fraudulent transfer claim. The court rejected each of those arguments. 303 F. Supp. 3d at 658-663.

5

A motion for reconsideration allows district courts to take a second look at their decisions, but only within narrow bounds. *See Quaker Alloy Casting Co. v. Gulfco Indus., Inc.*, 123 F.R.D. 282, 288 (N.D. Ill. 1988) ("[T]his Court's opinions are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure."). Thus, a request for reconsideration requires the movant to identify "a manifest error of law or fact or present newly discovered evidence." *Vesely v. Armslist LLC*, 762 F.3d 661, 666 (7th Cir. 2014) (internal quotation marks and citation omitted). Reconsideration is not an appropriate forum for rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion. *CBI Indus.*, 90 F.3d at 1269. *Accord*, *Vesely*, 762 F.3d at 666 (citing *Oto v. Metro. Life Ins. Co.,* 224 F.3d 601, 606 (7th Cir. 2000). The court expects parties to "wheel out all [their] artillery" to defeat summary judgment when such a motion is filed and briefed. *CBI Indus.*, 90 F.3d at 1270. "Belated factual or legal attacks are viewed with great suspicion, and intentionally withholding essential facts for later use on reconsideration is flatly prohibited." *Id.*

Many of the Trustee's arguments here violate those principles.

First, with respect to the issues of insolvency and the use of certain JP Morgan accounts: the court addressed this issue at length in its opinion. *See Grede*, 303 F. Supp.3d at 650-52; 664-66. The court explained there why it disagrees that the JP Morgan SMG III account, the account from which Sentinel paid UBS, included both SEG 1 and SEG 3 funds; so payment of UBS, an SEG 1 creditor, did not by itself establish fraud. Indeed, it is not clear to the court that inclusion of both SEG 1 and SEG 3 cash in a single account, even if improper, would by itself establish fraud. The Trustee points to language in *In re Sentinel Management Group, Inc.*, 728 F.3d 660, 666-68 (7th Cir. 2013) (*Bony I*) and evidence from *FCStone II*, 867 F.3d 767, 788 at 771–72 (7th Cir. 2017) to argue that this court misapprehended the difference between how Sentinel actually used its SEG 3 account and how it was legally required to handle the cash in that account according to CEA, CFTC, and IAA Rules. (Trustee's Motion for Reconsideration [138] ¶¶ 6–18.)

6

The Trustee is entitled to disagree with the court's analysis, but the court addressed *Bony I* and *FCStone* at length in its earlier opinion, and believes it has not misunderstood either of those cases. *See Grede*, 303 F. Supp. 3d at 662, 665–66, 669–70 (explaining that the key factor in *BONY I* was that the transferred funds were *pledged as collateral*, thus making the assets unavailable to Sentinel's customers).) Unlike the fact pattern in this case, where funds were moved out of segregated accounts, Sentinel pledged the client assets in *BONY I* as collateral; this placed customer assets at substantial risk of loss and thus demonstrated actual fraudulent intent. *Id.* at 665. In this case, however unwise it may have been to pool SEG 1 and SEG 3 cash in the JP Morgan Account, that pooling did not render the cash unavailable to the SEG to which it was allocated.

The Trustee also argues that Sentinel employee Jeff Logan gave testimony in the *FC Stone* case that "conclusive[ly]" shows that three JP Morgan cash accounts maintained by Sentinel corresponded to the SEG 1, SEG 2, and SEG 3 investment accounts. (Motion for Reconsideration ¶ 13.) As explained in its opinion, 303 F. Supp. at 664, the court sees nothing "conclusive" about the Logan testimony. Logan "believed" the cash accounts corresponded to the purportedly segregated investment accounts, but admitted he had no knowledge of the National Futures Association ("NFA") audit of the predecessor to that JP Morgan Account, which appeared to permit pooling of SEG 1 and SEG 3 cash. The court noted, further, that the Trustee's own expert in that case admitted on cross examination that SEG 1 and SEG 3 cash was held together in the JP Morgan accounts. 303 F. Supp. at 664-65. The Trustee similarly reviews arguments the court considered and rejected concerning the report of UBS's expert, Frances McCloskey; McCloskey concluded that just one of three sets of JP Morgan accounts was reserved for a single SEG, and Judge Zagel so found in his opinion in *Grede v. FC Stone, LLC*, 485 B.R. 854, 82 (N.D.Ill. 2013), *rev'd on other grounds*, *FC Stone I*, 746 F.3d 244 (7th Cir. 2014). The court declines to revisit its analysis of this evidence or of the holding in *FCStone II*.

7

Trustee next points out that the Trustee's evidence of undersegregation was undisputed and concludes from that undisputed fact that UBS did not present evidence of solvency at the time of the transfers. (Trustee's Motion for Reconsideration [138] ¶¶ 19–24.) The court has already addressed this argument, as well, explaining that "undersegregation" does not mean "insolvency." See 303 F. Supp. at 668. The Trustee's focus on undersegregation ignores the other findings in *FCStone II*, including its reference, with approval, to Frances McCloskey's opiinon that Sentinel did not misappropriate customer assets in any way other than pledging those customer assets as collateral for its own borrowing from the Bank of New York. (*Id.* at 668.) It was pledging client assets as collateral—not moving them out of segregation—that placed Sentinel's clients at risk.

Somewhat parenthetically, the court's opinion observed that if successful, the Trustee's logic would support a claim not just for the $14.4 million identified as interest, but for recovery of the full $108 million transferred to UBS on March 30. *Grede*, 303 F. Supp. 3d at 666. In his motion, the Trustee takes issue with this observation and asserts that the Trustee was entitled to assume that UBS would raise defenses under Section 548(c) of the Bankruptcy Code. (Trustee's Motion for Reconsideration [138] ¶¶ 25–26.) The Trustee could have pointed this out in the original briefing (UBS made the same point in its reply, to which the Trustee was permitted to respond), but it would not have altered the ultimate conclusion. The Trustee has not provided direct or circumstantial evidence of fraudulent intent on the part of Sentinel in making the March 30 transfer, nor has he otherwise established that the entire $14.4 million in cumulative interest paid to UBS constituted "false profits." *Grede*, 303 F. Supp. 3d at 668, 672. He offered no evidence concerning the specific securities on which UBS was earning interest, nor any proposed basis for calculating the amounts by which it was inflated. *Id.* at 668.

As the Trustee sees things, UBS has not met the burden of proof on its § 548(c) defense, including offering evidence of the extent to which it gave value for the interest it received. (Trustee's Motion for Reconsideration [138] ¶ 29.) The court instead believes the Trustee had

the burden to establish Sentinel's actual intent to defraud to avoid transfer under § 548(a)(1)(A). *Grede*, 303 F. Supp. 3d at 654–55. For the reasons explained at length earlier, the court found no evidence sufficient to establish fraudulent intent in the March 30 transfer. The communications between UBS and Sentinel at the time of that transfer show, at most, that UBS was curious or suspicious about the returns Sentinel was reporting. Nothing about those communications shows that Sentinel made the transfer for any reason other than the most obvious: it was required to do so. *Id.* at 666.

## **CONCLUSION**

UBS's Motion to Strike [148] Exhibits B and C and all portions of the Trustee's Corrected Reply [145] that refer to, or rely on, either of these deposition transcripts is granted. For the reasons stated, the Trustee's Motion for Reconsideration [138] of the court's summary judgment order [135] is denied.

ENTER:

*[signature]*

Dated: March 28, 2019

REBECCA R. PALLMEYER
United States District Judge